**SCOTT M. LOFTIN and JOHN W. MARTIN, Co-Trustees of Florida East Coast Railway, v. CHRISTINE DEAL.**

18 So. (2nd) 163 .      .                         January Term, 1944
May 19, 1944                                          En Banc
Rehearing Denied June 19, 1944

490

*Russell L. Frink, Robert H. Anderson, John H. Wahl, Jr.,* and *R. K. Lewis,* for appellants.

*Alley, Drew, Burns & Middleton,* for appellee.

THOMAS, J.:

At a crossing formed by the tracks of Florida East Coast Railway and a street of the City of Boynton Beach there was a collision between a special troop train and a truck in which William Deal was riding. He was instantly killed, and his widow, Christine Deal, prevailed in a suit for damages.

The train was proceeding north on the east track and the truck was traveling west. Deal was quite familiar with the intersection, as he had passed there continually for many years while delivering his produce to the platform maintained by the railroad company for the use of its patrons. The physical characteristics of the locality are quite important in determining the merits of the appeal, so before we proceed further we will undertake to describe them, using approximate dimensions and distances.

Beginning thirty feet from the south line of Lake Street, which the deceased was traveling when struck, and extending southerly for 225 feet and ten feet distant from the nearest rail of the northbound track was a platform four feet in height. It was triangular in shape, six feet in width at the point nearest the crossing, and thirty feet wide two hundred feet farther south. Along the east side of the platform was a spur track, and immediately east of that a paved street which entered Lake Street at right angles. The platform was roofed, but was open except for two small enclosures used as offices. On the east side of the main track and north of Lake Street was a warning signal designed to flash alternate

red lights upon the approach of a train, and west of the crossing and south of the street was a device of the same kind.

Deal was seen on the platform shortly before the collision, and evidently he proceeded from there northerly, thence westerly to the crossing. Whether in his course he drove so close to the platform as not to be able to observe the lights facing that entrance to the intersection cannot be definitely determined from the testimony.

Three circumstances seem not in dispute: the nature of the platform, the relative positions of adjacent tracks and streets, and the speed of the train, which was sixty-five miles per hour. Because of the size of the platform and its proximity to the main line, the street, and the crossing we think the conclusion may be logically drawn that there was such an obstruction of the view to the south as to make the intersection extremely dangerous. It is clear that it was necessary for a vehicle to be almost upon the track—one witness testified that a car had to be within four feet of it—before the driver could see an oncoming northbound train. Of course, the consequences of getting in the path of a thousand tons, the weight of the train in question, of metal hurtling along at ninety-five feet a second are frightening. There was a preponderance of evidence, however, that the whistle was blown repeatedly as the train neared the scene and that the bell on the locomotive was ringing. When the engineer saw the truck perilously near the track he applied the emergency brakes and brought the train to a stop as quickly as he could without derailing it. Only contradiction of the statements that the whistle and the bell were sounded was the testimony of one witness who said simply that he did not hear, which may have been attributable to the blustery day. There was abundant proof, too, that the signal lights were flashing. Uncontroverted was the evidence that they were so constructed as to become energized when a train came within three thousand feet of the crossing and that each device contained two lights with two filaments, so that both filaments in both lights would have to fail before the signal ceased to function, a remote possibility. More important,

there was no contradiction of the testimony of an inspector who stated positively that a few days before the accident and the day afterward the apparatuses were tested and found working properly. There was no dispute whatever about the good condition of the surface of the crossing. No one denied the story of a traveler who approached from the opposite direction immmediately before the mishap and who had an unobstructed view of the oncoming train, the truck, and the collision. He testified that the red signal light facing him on the west side of the track was functioning. He saw and heeded it and made a frantic effort to warn the deceased of the impending danger.

In these circumstances we must determine whether the speed of the train at the place we have described and under the conditions we have related was negligence and whether the deceased made a contribution in negligence to his own death.

The company had found it necessary to construct the platform and buildings the better to serve the public, and yet in that very effort an obstruction was created and congestion occasioned. There was sure to lurk some danger of collision between passing trains and vehicles hauling produce to the station. Obviously the company had diligently tried to minimize that danger by the maintenance of an adequate signal system. The engineer attempted further to lessen the danger in this particular instance by sounding the whistle and ringing the bell, yet Deal went on the track, not heeding these sounds if he heard and not paying attention to the warning of the other traveler if he saw.

The whole picture leads us to believe that negligence was chargeable to both parties to the cause: to appellants on account of the speed of the train at that particular point; to appellee because deceased entered the danger zone, with which he was entirely familiar, heedless of the warnings being given by the train, the signal device, and the other traveler. The jury probably so found, invoking the rule of comparative negligence, Section 768.06, Florida Statutes, 1941, and F.S.A., as they were charged by the court to do if

they found the circumstances justified that course. The amount of the verdict indicates that this was their purpose.

This deduction makes important a brief history of William Deal and his family. He was forty-two years of age; his wife was forty. He enjoyed good health, and according to the mortality tables had a life expectancy of approximately twenty-six years. As an industrious farmer he earned from two to three thousand dollars a year. That he was thrifty as well as hard-working is indicated by evidence that he had paid all but one hundred dollars of the purchase price of his farm and at the time of his death had on deposit in the bank a substantial fund. His probable future earnings, calculated from annuity tables on the basis of the lesser income and reduced to a present value, amounted to nearly twice the sum which the jury found the appellee should recover. In addition to this loss, the appellee was deprived of his comfort, protection, and society. It was established by the witnesses that he was a person of good character and habits and that he had provided well for the appellee and their ten children, all of whom were minors at the time of his death. The entire family seems to have merited the respect of the residents of the community where they had lived for many years.

Considering the elements of damage which may be calculated from the tables and those which are not subject to precise computation, it appears from the evidence that a verdict could have been approximately rendered for more than twice the amount appellee recovered, had it been proved that the death resulted solely from the negligence of the appellants. Doubtless the jury, as we have already observed, concluded the deceased was also at fault and fixed the amount of recovery at such "proportion of the entire damages sustained, as the defendant's negligence [bore] to the combined negligence of both . . ." Section 768.06, supra. Feeling that this is the conclusion reached by the jury and that they were justified in it we will not disturb the judgment.

Affirmed.

BUFORD, C. J., TERRELL and SEBRING, JJ., concur.

494

BROWN, CHAPMAN and ADAMS, JJ., dissent.

CHAPMAN, J., dissenting:

It is my conclusion that the facts involved in this case are ruled by Powell v. Gray, 146 Fla. 334, 200 So. 854; Roberts v. Powell, 137 Fla. 159, 187 So. 766, and similar cases. I therefore dissent from the opinion prepared by Mr. Justice THOMAS.

BROWN, J., concurs.