TERRELL, Justice.
This action was brought by appellant against appellees to recover damages for the wrongful death of her husband in a railroad crossing accident near Quincy in Gadsden County, Florida. At the trial defendants moved for a directed verdict at the close of plaintiff’s case and at the close of the trial. The court reserved judgment on both motions and let the case go to the jury which returned a verdict against the Seaboard Airline Railroad Company and in favor of defendant Tucker. Defendants then moved to set aside the verdict and renewed their motions for directed verdict. The trial court granted the mo *528 tion to set aside the verdict and entered final judgment for defendants. The plaintiff has appealed.
The point for determination is whether or not the trial court committed error in setting aside the verdict and entering final judgment for the defendants.
The answer to this question turns on the interpretation of the evidence. In reviewing the evidence the rule is that it be weighed in the light most favorable to the plaintiff. In such review, however, we are not to overlook the presumption that the trial court’s ruling was correct. Roberts v. Powell, 137 Fla. 159, 187 So. 766; Kraver v. Edelson, Fla., 55 So.2d 179; Dodson v. Solomon, 134 Fla. 284, 183 So. 825.
The primary reliance of appellant for reversal is, that this is a comparative negligence case and that the cases cited in the preceding paragraph did not arise from cases growing out of the comparative negligence, statute. It is quite true that the cited cases did not arise from cases that stem from the comparative negligence statute but the direct question involved concerns judicial review of the evidence on which the jury predicated its verdict and if in law it was not supported by substantial legal evidence, the trial court had the power to set it aside. As we understand judicial review of the verdict in a case like this is no different from what it is in other cases where the power is authorized to determine the legal effect of the evidence. It is not concerned with the jury’s power to weigh conflicting evidence.
■Section 768.06, Florida Statutes, F.S.A., is the comparative negligence statute and is as follows:
“No person shall recover damages from a railroad company for injury to himself or his property, where the same is done by his consent, or is caused by his own negligence. If the plaintiff and the agents of the company are both at fault, the former may recover, but the amount of recovery shall be such a proportion of the entire damages sustained, as the defendant’s negligence bears to the combined negligence of both .the plaintiff and the defendant.”
The jury returned a verdict for $32,500, one-half of the amount laid in the ad damnum. Whether the ' jury considered the railroad company solely liable or whether it considered the deceased and the railroad company both liable and apportioned the damages as provided in the concluding sentence to the quoted statute, we are left to conjecture. Appellant contends that they found both parties guilty of negligence and apportioned the damages. In Loftin v. Deal, 154 Fla. 489, 18 So.2d 163, and in Atlantic Coast Line R. Co. v. Pidd, 5 Cir., 1952, 197 F.2d 153, this procedure was approved apparently on the theory that the verdict was much smaller than the amount claimed and being so, the jury fixed an amount pursuant to the provision of the statute.
In his final judgment the trial court set the verdict aside and entered judgment for defendants on the ground that the evidence shows “the sole proximate cause of the accident which gave rise to this action was the negligence of the plaintiff’s deceased husband.” The accident took place at the intersection of the railroad and what is known locally as Santa Lee Highway just outside the City of Quincy. At this point the railroad runs in a general east and west direction but curves to the north at a point 271 feet west of the crossing. Santa Lee Highway runs north to south crossing the railroad on the curve where the rails are banked; in other words, the outside rail is four inches higher than the inside rail. At the time of the accident, the train was traveling east and decedent was driving his truck south. Santa Lee Highway is of clay construction as was the crossing. The area near the crossing is frequented with tenant farm homes. The crossing is located about three-quarters of a mile from Quincy station. It is the sec *529 ond of five crossings within the last mile before reaching the Quincy station.
Appellant contends that the northwest corner of the intersection was obscured by a house, a tree, corn in full tassel, dog kennels, cane and weeds, making it difficult for the motorist to be seen down the track when approaching the crossing from the north. It is contended that said vegetation grew along the west side of the road to within a few feet of the railroad. The height of this vegetation was estimated by various witnesses as “real tall,” “six feet or better tall,” from “waist high” to “over my head” and “just about as high as my head and I’m 5 feet 6.” Back from the road and the track it is said the vegetation increased in height from 10 to 12 feet. One witness testified that even though a train would be taller than the weeds, they would block the view of a motorist because they would be higher than his eyes and would shut off his view from his car windows. On the basis of this showing, appellant contends that there was ample evidence for the jury to conclude that the crossing was a blind and extremely hazardous one for a motorist approaching it from the north.
The accident occurred about 1:30 P.M., June 27, 1953; it had been raining during the forenoon, the clay road was wet, slick and muddy. The witnesses agreed that when wet the road and crossing were as slippery and treacherous as ice. One witness testified that a number of motorists had skidded off the road and into the ditch that morning and that the ambulance and wrecker which came to the scene skidded into the ditch. The witness Brown stated that the road and crossing were “exceptionally slick” and “exceptionally rough and washboardy.” Other witnesses testified that this road, the crossing and the approaches were “wet and slick,” “muddy and slippery,” “full of holes,” having “ruts,” “beat out in holes,” and as “being slick,” “muddy.”
Decedent was delivering groceries and stopped his truck about 100 feet north of the crossing to make a delivery; seated on his right in the cab of the truck were two women whom decedent was giving a lift. In the rear of the truck were groceries for delivery and four children who were laughing and eating candy. After making his delivery, decedent started slowly toward the crossing at a speed estimated from one to three miles per hour. When the truck was about half over the crossing, the train traveling about 50 miles per hour struck it about the middle of the body. All the occupants were killed. The train was 630 feet long, the engine was approximately 14 feet high and ran about 2,400 feet before it came to a stop.
The evidence shows that the railroad’s right-of-way extended only eight feet from center on either side at and near the crossing so defendant had no authority to clear farther than its right-of-way extended. It is true that some of the witnesses testified that an approaching train would not be visible as one approached the crossing but the police officers who investigated the accident testified to the contrary. Deputy Sheriff Martin testified that before a driver reached the crossing he could see the rails almost to the next crossing, 1,354 feet to the west. The highway patrolman testified that a motorist could see the train approaching from the west approximately 95 feet north of the crossing. Photographs taken near the time of the accident amply support the testimony of these witnesses. It is also shown that decedent had lived on this road, near the crossing for eight months and passed over it every time he went to town and was well acquainted with it. Then as he approached the railroad, he was confronted with a standard road crossing sign with the legend, “Railroad crossing, look out for the cars,” spread all over it.
As to speed of the train at the time of the accident, the evidence shows conclusively that it was running 50 miles per hour. The crossing was in a rural community where the speed limit was 59 miles per hour. The engineer testified that he was approaching the Quincy station and *530 was preparing to stop. Since the train was proceeding at an allowable speed, that with nothing more does not constitute, actionable negligence. It must be shown that alleged excessive speed was the proximate cause of the accident. Seaboard Airline R. Co. v. Tomberlin, 70 Fla. 435, 70 So. 437; Atlantic Coast Line R. Co. v. Timmons, 160 Fla. 754, 36 So.2d 430; Van Allen v. Atlantic Coast Line R. Co., 5 Cir., 1940, 109 F.2d 780.
It is next contended (1) that the train crew was negligent in that it failed to keep a proper lookout as the train approached the crossing, (2) that the train crew failed to give proper warning of its approach.
The evidence shows that the truck approached the crossing on the fireman’s side of the locomotive and that when he (fireman) realized that decedent was not going to stop, he warned the engineer who immediately applied his emergency brakes. It is the law of this state that the train has the right-of-way and is not required to be retarded until it becomes apparent that one approaching the track is not going to stop. Florida Cent. & P. R. Co. v. Williams, 37 Fla. 406, 20 So. 558; Atlantic Coast Line R. Co. v. Miller, 53 Fla. 246, 44 So. 247; Martin v. Rivers, Fla., 72 So.2d 789. As to whether the train crew gave ample warning, it is true that some negative testimony says no, but four impartial witnesses for defendants testified that they saw the train approach the crossing and heard it blow repeated blasts. In addition to these, the engineer and the fireman both testified that the whistle was blown repeatedly before it reached the crossing. This court is committed to the doctrine that negative testimony will not make an issue in the face of positive testimony that the signals were given. Powell v. Gary, 146 Fla. 334, 200 So. 854, and cases discussed therein.
The next question challenges the condition of the crossing. It is true that several witnesses testified as to holes in the crossing, that it was wet and slick while others testified that it was in good condition. Two police officers who arrived at the crossing to investigate shortly after the accident, testified that the crossing was in good condition. The road maintenance man of the county testified that he had worked the road a few days before the accident, that he scraped dirt off the crossing and left it smooth and in good condition. A photograph of the crossing was placed in evidence and shows that the crossing was in good condition. Only two witnesses were close enough to observe the truck and both testified that it had no difficulty in negotiating the crossing. One of these witnesses testified that he had driven a truck over the crossing earlier in the day and had no difficulty getting over. There was no other testimony from any one who had driven the crossing that day.
It is true that sec. 768.05, Florida Statutes, F.S.A., indulges the presumption of negligence on the part of the railroad but it is not an irrebuttable presumption, it is not evidence but will give way in the face of evidence showing an exercise of due care. Covington v. Seaboard Airline R. Co., 99 Fla. 1102, 128 So. 426; Atlantic Coast Line R. Co. v. Price, Fla., 46 So.2d 481; Van Allen v. Atlantic Coast Line R. Co., supra; Atlantic Coast Line R. Co. v. Voss, 136 Fla. 32, 186 So. 199. Motorists are on notice that a train has the right-of-way and that they (motorists) are required to look and listen and if necessary stop as they approach a crossing. St. Louis-San Francisco R. Co. v. Earl, Fla., 49 So.2d 324; Atlantic Coast Line R. Co. v. Timmons, supra; Germak v. Florida East Coast R. Co., 95 Fla. 991, 117 So. 391; Seaboard Airline R. Co. v. Myrick, 91 Fla. 918, 109 So. 193; Florida East Coast R. Co. v. Townsend, 104 Fla. 362, 140 So. 196, 143 So. 445.
This court early approved the universal law that the “engineer in charge of a railroad locomotive has the right to presume that an adult person whom he sees upon or beside the track ahead of his approaching engine is in possession of his faculties, *531 and that he will obey the instinctive law of self-preservation by getting off the track if already on it, or that he will not get on it, if already off; and, in such case it would not be negligence on the engineer’s part if he failed to attempt to stop his engine, unless he knew the party, and that he labored under some disability.” Florida Central & P. R. Co. v. Williams, supra [37 Fla. 406, 20 So. 559]. Other cases could be cited but they proceed on the theory that responsibility of the railroad and motorist or pedestrian at the crossing is mutual and where either or both fails in this they will be held responsible. This rule is deeply rooted in our social structure and the reasons for it are grounded on the historic dependence of the public on the railroad and the railroad on the public. The ingenuity of the pioneer aided by the railroad has been the greatest factor in developing the country and sustaining its economy, hence this and other rules emphasizing mutuality of responsibility. All this boils down to the fact that a pedestrian or a motorist must keep his eyes open, his mind alert and take due precaution for his safety when he approaches a railroad crossing.
Decedent knew that he was approaching the railroad where trains passed constantly each way day and night; it was broad daylight and he was confronted by a standard “Railroad Crossing” sign warning him to “look out for the cars.” When the negative, the speculative, the indecisive and the inconclusive evidence is disregarded, the substantial legal evidence supports the final judgment of the trial court. It is conclusively shown that decedent could have seen the train and avoided the accident if he had looked, so the condition of the growth near the road, its alleged wet and slick condition or who slipped on it that day had no influence in causing the accident. We have reviewed the evidence at length with the view of pointing out that which is substantial and that which is not so. We are convinced that the verdict was contrary to the manifest weight of the evidence. When the trial court so finds, it is his duty to grant a new trial.
The judgment appealed from is accordingly affirmed in so far as it sets aside the verdict but with directions to grant a new trial.
Affirmed.
DREW, C. J., and ROBERTS and O’CONNELL, JJ., concur.