130 So.2d 580 (1961)
Doris TYUS, Petitioner,
v.
APALACHICOLA NORTHERN RAILROAD COMPANY, a corporation organized and existing under and by Virtue of the laws of the State of Florida, Respondent.
No. 30274.
Supreme Court of Florida.
May 17, 1961.
*581 Clyde W. Atkinson, Tallahassee, for petitioner.
J. Lewis Hall and Donald O. Hartwell of Hall, Hartwell & Douglass, Tallahassee, for respondent.
*582 HOBSON, Justice.
This cause is before us on petition for writ of certiorari which alleged direct conflict on the same point of law between the decision of the District Court of Appeal, First District,[1] and a prior decision of another District Court of Appeal, as well as a prior decision of this court. We noted probable jurisdiction and issued the writ.
This suit arose cut of a railroad crossing collision. A jury trial resulted in a verdict in favor of the widow of the driver of a truck which was hit, as it crossed the railroad tracks, by one of defendant's trains. Defendant-respondent's post trial motions were denied and final judgment entered. On appeal, the District Court of Appeal reversed the circuit court judgment and remanded the cause with directions that a judgment be entered for the respondent.
The facts as stated by the District Court of Appeal are:
"The evidence shows that the plaintiff's decedent was driving an eight-ton cabin type truck and trailer loaded with fourteen tons of brick in an easterly direction on a highway near a small unincorporated community about 8:00 o'clock on a clear winter morning. Decedent was familiar with the crossing, having passed over it frequently as part of his job route. On the morning of the unfortunate accident he approached the crossing at a speed of between 35 to 50 miles an hour. Although there were signs indicating a crossing posted at 400 feet and 200 feet from the crossing, there is no evidence that the plaintiff's decedent slowed up, accelerated his speed or applied his brakes as he approached the tracks.
"The engineer's testimony, which was corroborated by the fireman, brakeman, flagman, and conductor [all employees of the respondent and, naturally, interested witnesses], was to the effect that the train was proceeding from the north in a southerly direction on a slight downgrade at between 15 and 20 miles an hour, that the whistle was blown at the customary distance of about 600 feet from the crossing and the bell was rung at the same time. The engineer testified that he caught a glimpse of the truck which the decedent was driving between some trees and a house located alongside the track when the train was about 100 feet from the crossing and that `just a matter of a couple of seconds, it popped up' in front of him, whereupon he turned the whistle cord loose, shut off the throttle, and braced himself behind the control stand but not before it was too late to avoid the collision.
"* * * In attempting to forestall proof that defendant's agents exercised the proper degree of care, plaintiff produced evidence in opening to the effect that the engineer did not blow his whistle, that he was running the train too fast for the environment, and as to the latter, that the plaintiff's line of vision was obscured by a tree, house, and undergrowth in the defendant's right of way. As to whether a proper warning was given, all of the defendant's and most of the plaintiff's witnesses testified that the whistle was blown at least a few seconds before the accident. The witnesses who attempted to establish that the whistle was not blown testified merely that they `didn't hear it blow.'" (Italics supplied.)
This case has apparently become complicated because of a misunderstanding of the real points to be considered and determined. It may be that the author of our original opinion was partially responsible for this enigmatic situation. In the original opinion he used the case of Myers v. Atlantic Coast Line Railroad Company, Fla., 112 So.2d 263, as the primary example of a decision of this court with which the *583 opinion and decision of the District Court herein is in direct conflict. Of the verity of that position he still entertains no doubt. Nevertheless, on the real question before this court, there is an unbroken line of decisions rendered by the Supreme Court of Florida and at least one decision of the District Court of Appeal, Third District,[2] with which the District Court's opinion and decision in this case is in direct conflict on the same point of law.
The true query before is us whether, if there be conflicting testimony on the question of the defendant's negligence in a tort action, particularly wherein the comparative negligence rule is applicable, is such question for the jury or may it be determined by the court as a matter of law. Not only is this question in this jurisdiction absolutely within the province of the jury to determine, but such is the universal rule.[3]
The Myers case was used in the original opinion because the facts of that case as disclosed by our opinion are almost on "all fours" with the factual situation depicted by the opinion of the District Court herein.
It was not necessary in order to determine the existence of a conflict on the same point of law to discuss and compare the Myers case because such direct conflict with the opinion and decision of the Third District Court of Appeal in the Martin case, and all of our adjudicated cases on the pertinent questions appears on the face of the District Court's opinion. That court said "As to whether a proper warning was given, all of the defendant's and most of the plaintiff's witnesses testified that the whistle was blown at least a few seconds before the accident." (Italics supplied.)
The foregoing statement in the District Court's opinion is one which must be given the connotation that some of the witnesses testified to the contrary.
The above quoted finding and conclusion of the District Court clearly demonstrates the fact that there was a conflict in the testimony on the question of defendant's negligence in a two-fold aspect. Each of these prongs of the one salient question was for the jury: (1) Whether any warning signal was given; (2) whether such a signal, if given, was adequate.
The District Court in its opinion acknowledged the connotation which we have ascribed to its statement. In explanation of this admission of a conflict in the testimony upon the question whether a warning signal was given and, if given, whether it was adequate, and in order to avoid the impact of our decisions listed under footnote 3, the District Court stated "the witnesses who attempted to establish that the whistle was not blown testified merely that they `didn't hear it blow.' Our supreme court has consistently held that negative testimony will not make an issue in the face of positive testimony that the signals were given. Powell v. Gary, 146 Fla. 334, 336, 200 So. 854."
*584 Our examination of the opinion in the Powell case convinces us we did not unequivocally state, nor did we even by inference suggest, that "negative testimony will not make an issue in the face of positive testimony that the signals were given." Indeed, we cannot find any case in which we have indubitably, or at all, pronounced such a rule. On the contrary, our conclusion, with reference to the relative weight which should be given to negative and positive testimony, was [146 Fla. 334, 200 So. 855]:
"As stated in Seaboard Air Line R. Co. v. Myrick, 91 Fla. 918, 109 So. 193, 195:
"`It is not alone sufficient for the injured plaintiff to say that he "did not see" the approaching train, nor hear any whistle or bell or noise of its approach, in order to overcome positive evidence that all ordinary warnings were given of the train's approach. When negative testimony is relied upon to contradict positive evidence, it should appear that the negative statements were made by persons whose attention was directed to the fact that they were looking, watching and listening for the fact. Not only that the opportunity for observing the fact existed, but that their attention was directed to the fact * * *'"[4]
The above statement accords not only with reason and logic, but also with the great weight of authority.[5] As stated in American Law Reports, annotated:
"As already indicated, the probative force of testimony that crossing signals were not given, or that they were not seen or heard, on the approach of a train, depends largely upon whether such testimony is regarded as negative or positive in effect, and upon the attendant circumstances  whether or not the witness was in such a position that it would be presumed that he would have observed the signals if given, whether or not he was listening, watching, or otherwise attentive to the situation, the condition of his sense of sight or hearing, attendant noises, the blowing of wind, etc. A distinction is made, too, in some jurisdictions, between testimony positively declaring that signals were not given, and testimony stating merely that the witness did not hear or see them.
"If all testimony to the effect that signals were not given on the approach of a train to a crossing should be regarded as wholly without probative force purely on the ground that it was negative testimony in that it was testimony to the effect that an event did not occur, the plaintiff in a crossing accident case would be without means of proof that the signals were not given, and so could never rely upon the failure of the signals as proof of negligence on the part of the defendant, which in many cases is absolutely necessary in order to prove any negligence whatsoever on the part of the defendant."[6] (Italics supplied.)
In making the bald statement to the effect that this court has consistently held that negative testimony will not overcome positive testimony, the District Court has, on the face of its opinion, created a definite conflict on the same point of law, not only with our decision in the Powell case, but also with our pronouncement in the case of Seaboard Air Line Railway Co. v. Myrick, 91 Fla. 918, 109 So. 193, 195. See also Loftin et al. v. Kubica, Fla. 1953, 68 So.2d 390, 392.
*585 The gist of our rule in relation to negative testimony in the face of positive testimony to the contrary is that if a jury decides that the attention of the witness whose testimony is negative in character, is actually directed to the fact or situation, about which he later testifies, regardless of the reason therefor, said jury may consider such negative testimony and accord to it the weight it may deem proper.
Moreover, in the present case the jury should have been permitted, as it was by the trial judge, to consider the positive testimony of all the witnesses who testified to the effect that "the whistle was blown at least a few seconds before the accident," (Italics supplied.) and to decide whether the warning signal was adequate under all the facts and circumstances disclosed by the testimony presented to it.
Since we have concluded that, on the face of the subject opinion of the District Court,[a] it appears there can be no doubt about the question of direct conflict with many of our prior decisions, as well as the decision of the District Court of Appeal, Third District, in Martin v. Rivera, 99 So.2d 617, it becomes our duty and responsibility to consider the case on its merits and decide the points passed upon by the District Court which were raised by appropriate assignments of error as completely as though such case had come originally to this court on appeal.[7] We will now assume that responsibility and perform the duty which devolves upon us. We shall also again discuss the similarity between this suit and the Myers case.
In the Myers case, Mrs. Gandee testified in answer to the question "Mrs. Gandee, you are quite sure the train did not blow?" "Yes, that is a positive fact." She further testified that she was looking and for a brief interval saw the train move along the track before it again left her line of vision. She stated that while she was looking the diesel did not blow its horn.
Mrs. Scott in the instant case testified positively that she was listening to the train although she was not looking at it. In answer to the question "Did it blow that morning?" she stated "No, sir, I didn't hear it."
If the above testimony of these two ladies in each case be taken out of context it would appear that Mrs. Gandee testified positively upon the issue whether the diesel blew its horn and that Mrs. Scott's testimony was equivocal and possibly negative in character. However, the quoted questions and answers should not be taken and considered out of context. They should be studied in the light of all of the relevant testimony given by each of these ladies.
Each of these witnesses gave the same reason for having her attention directed to the point in issue about which she was called upon to testify.[8] Each of these mothers testified positively that she had her attention focused upon the approaching train because she had been in the habit of showing the passing train to her interested baby. It was for a jury, rather than any appellate court, to decide the verity of such testimony.
The only difference between the testimony of Mrs. Gandee and that of Mrs. Scott was that for a short interval the former was looking at the train. The only significance which can be attached to this fact is that it could be considered by the jury as one of the indicia of the witness's attentiveness to the incident concerning *586 which she was called to testify. The fact that Mrs. Gandee was looking and at one point saw the train adds nothing to her testimony to the effect that the diesel engine did not blow its horn. This is so because it is a matter of common knowledge that, unlike the steam whistle of the locomotive of the yesteryears, the horn of a diesel engine does not emit vapor which is visible to an onlooker. The train in each of these cases was being propelled by a diesel engine or engines. In order to determine whether the horn of the diesel engine blew a warning signal both Mrs. Gandee and Mrs. Scott were wholly dependent upon their auditory senses.
As aforestated, each of these ladies testified positively that her attention was directed to the fact concerning which she was called upon to testify and gave the same logical reason therefor. One said the horn did not blow (Myers case); the other stated (the instant case) "No, sir, I didn't hear it." Some ultra, ultra logician might claim that he can discern a distinction between the testimony of Mrs. Gandee on the one hand and Mrs. Scott on the other, but in reality there is no difference when the testimony of each is considered in context.
Upon a reconsideration and a more careful analysis we have reached the conclusion that the testimony of each of the subject witnesses was not negative "in effect" but was as positive upon the point at issue as either could possibly have made it. It is only by the use of the sense of hearing that anyone can say that a diesel engine blew or did not blow its horn. Looking and watching  terms which we used in the case of Powell v. Gary, supra  are passe in this period of modernity, except as indicia of attentiveness to the situation concerning which one might later be called to testify.
At this juncture we will discuss briefly the testimony of Mr. L.D. Haire, who was a witness in the instant case. He testified that he was outside of his house cleaning an evaporator; it was real calm and cold; sound was carrying well; he could hear very well; he did not hear the whistle blow, although he was standing out there and could have heard it had it blown. He heard it blow only once about two seconds before the collision, his exact words being "The whistle blowed but it just did blow."
Assuming, arguendo, that Mrs. Scott's testimony, as well as that of Mr. Haire, was negative in character, there was under our pronouncement in Powell v. Gary, supra, and in other cases hereinabove cited, a conflict in the testimony upon the vital issue whether an adequate warning signal was given and the query in this case was properly submitted to the jury and decided by it. It was for the jury to weigh and evaluate such testimony, even if it should be considered negative "in effect," and determine "whether or not the witness was in such a position that it would be presumed that he would have observed the signals if given, whether or not he was listening, watching, or otherwise attentive to the situation, * * *".
If the District Court had been correct in classifying the testimony of the plaintiff's witnesses on the subject issue as negative rather than positive, it is clear from the District Court's opinion in the present case that had it applied the true Florida rule on the comparative weight of negative and positive testimony, as required by Powell v. Gary, supra, and other cases hereinabove cited, it would not have disturbed the jury's verdict on this issue.
There can be little, if any, doubt that a presiding judge in a railroad accident case with facts similar to those of the Myers case and those in the instant litigation would find himself in a quandary in attempting to decide which of said decisions he should follow in making his rulings. Moreover, such judge would find it difficult indeed to unravel the confusion which now exists because of the District Court's statement "that negative testimony will not make an issue in the face of positive testimony *587 that the signals were given." [114 So.2d 36] This is true because the pronouncement made by the District Court is in direct conflict, rather than in harmony, with our decisions in Powell v. Gary, supra, and Seaboard Air Line Railway Co. v. Myrick, 91 Fla. 918, 109 So. 193, 195, wherein we laid down the yardstick to be used by a jury in evaluating negative testimony and determining the probative force which should be accorded to it.
The foregoing is a fair criterion by which the question of conflict may be determined. The instant decision of the District Court of Appeal would, absent a review by this court, unquestionably leave the law of this state upon the question under discussion in a state of confusion. We have held that the primary purpose of the provision in amended Article V of the Florida Constitution in cases wherein there is a direct conflict on the same point of law with a prior decision of this court or another District Court of Appeal is to avoid confusion and to maintain uniformity in the case law of Florida. N. & L. Auto Parts Company v. Doman, Fla., 117 So.2d 410; Board of Commissioners of State Institutions v. Tallahassee Bank & Trust Co., Fla., 116 So.2d 762.
We now turn to the second ground of reversal discussed by the District Court of Appeal, to-wit: The alleged "prejudicial remarks of [petitioner's] counsel made during closing argument."
While we agree that the remarks of petitioner's counsel quoted in the District Court's opinion might have been subject to timely objections (which were not made), we cannot agree to said court's conclusion that "standing alone, the stated remarks constitute grounds for reversal, notwithstanding the effort of the trial court to remove their effect by instructing the jury to disregard them." The trial judge not only sustained every objection which was made to alleged prejudicial remarks, but also charged the jury to disregard them and to base its verdict exclusively upon the evidence as presented from the witness stand.
As is disclosed by our opinion in Seaboard Air Line Railroad Co. v. Strickland,[9] we are committed to the rule that in the ordinary case, unless timely objection to counsel's prejudicial remarks is made, the appellate court will not reverse on review. This rule is subject to the exception that if the prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, a new trial should be awarded regardless of the want of objection.[10]
Mr. Justice O'CONNELL has shown me the courtesy of presenting to me for my consideration his dissent, on rehearing granted, to that part of my opinion in the Tyus case wherein we held that the alleged prejudicial remarks, to which no objections were made during the trial, did not "pervade" or according to the definition of said word did not run throughout or permeate the trial. In the case of Seaboard Air Line Railroad Co. v. Strickland, 88 So.2d 519, it might have been better had the author of that opinion not used the word "pervade". Upon reconsideration of my revised opinion I must agree with O'CONNELL, J., that in order to employ the exception to the general rule where no objections are made to alleged prejudicial remarks or conduct, such remarks or conduct need not begin at the outset of a trial and continue intermittently to its conclusion. However in the instant suit we hold that the so-called harmful conduct "in its collective impact" cannot be said to have gravely impaired the calm and dispassionate consideration of the evidence and the merits by the jury.[11]
*588 We believe that the charge given in this case by the able circuit judge was sufficient to alleviate any harm to the defendant which might otherwise have existed by virtue of the alleged prejudicial remarks made by counsel for the petitioner only in his closing argument.
We are of the opinion that when the charge delivered by the trial judge is considered together with the fact that respondent failed to object to the alleged prejudicial remarks relied on by the District Court of Appeal as the basis for its holding on this issue, coupled with the fact that the alleged "prejudicial conduct" took place only during petitioner's closing argument and was not so extensive that its influence pervaded the trial, it is crystal clear this case should not have been reversed even for a new trial.
Moreover, it is most significant that in the instant litigation the veteran and learned trial judge, who was in the milieu of the court room throughout the trial and who was therefore in a much better position than this court or the District Court to determine whether the alleged prejudicial remarks were actually "in effect" of such character, denied a motion for a new trial.
No useful purpose would be served by submitting the factual issues in this case to a second jury for a retrial thereof because we find that such issues were fairly considered and determined by the jury in the trial which has been completed under appropriate charges by the circuit judge who presided in the nisi prius court.
For the reasons above stated the decision of the District Court of Appeals herein should be, and it is hereby, quashed, with directions that the judgment of the trial court consequent upon the verdict of the jury be reinstated.[12]
THOMAS, C.J., TERRELL, J., and FITZPATRICK, Circuit Judge, concur.
ROBERTS, DREW and O'CONNELL, JJ., concur in part and dissent in part.
O'CONNELL, Justice (dissenting in part).
I concur with all of Mr. Justice HOBSON'S opinion on rehearing except that portion thereof which deals with the second ground of reversal discussed by the District Court of Appeal, to-wit: The alleged "prejudicial remarks of [petitioner's] counsel made during closing argument." I am of the opinion that the prejudicial remarks of petitioner's counsel require reversal of this cause for a new trial.
I agree that we are committed to the rule that in the ordinary case we will not reverse a case on appeal because of prejudicial remarks of counsel, unless timely objection was made to such remarks.
However, I do not agree that the exception to the aforementioned rule operates only where the harmful conduct extends or spreads throughout the whole trial in the sense that the improper conduct must have been committed at various times throughout the whole of the trial. As I view it, it matters not at what point or how often during the trial the conduct was committed. It is the effect thereof on the right of the parties to a fair and impartial trial, free from passion, prejudice, and extraneous factors, that determines whether the trial is infected thereby to the extent that a new trial should be ordered. Therefore under my view it matters not that the prejudicial remarks here complained of were delivered only during the closing argument and not throughout the trial.
An examination of the cases dealing with this question indicates that in many, if not *589 most, the improper conduct was committed during the closing argument, as in this case. See Griffith v. Shamrock Village, Fla. 1957, 94 So.2d 854; Tampa Transit Lines v. Corbin, Fla. 1953, 62 So.2d 10; Baggett v. Davis, 1936, 124 Fla. 701, 169 So. 372, 379 (civil cases); and Akin v. State, 1923, 86 Fla. 564, 98 So. 609, 612; Singer v. State, Fla. 1959, 109 So.2d 7, 28; Pait v. State, Fla. 1959, 112 So.2d 380 (criminal cases).
The statement that the exception to the rule requiring objection to improper conduct comes into operation if such conduct "in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury" as set forth in the majority opinion had its birth in the case of Seaboard Air Line Railroad Co. v. Strickland, Fla. 1956, 88 So.2d 519, 523.
In the last cited case this Court did not say that it would reverse a case for prejudicial remarks, which were not objected to, only in event that the influence of the conduct was so extensive as to pervade the whole trial. As I read that case we merely said that the general rule did not prevent reversal in a case where the prejudicial conduct was of the extent and influence as described therein. This does not mean that the exception is limited to those cases where the conduct pervades the whole trial in the sense that it extends from beginning to end thereof, if the conduct gravely impairs a calm and dispassionate consideration of the evidence and merits by the jury.
The statement of the exception in the Seaboard Air Line Railroad Co. v. Strickland case was only one definition of it. It was not intended to be and is not the sole or exclusive definition of the exception to the rule.
In Seaboard Air Line Railroad Co. v. Strickland, above cited this Court cited five cases in support of its opinion and decision.
Two of the cases relied upon were cases previously decided by this Court. They are:
(1) Seaboard Air Line Ry. v. Smith, 1907, 53 Fla. 375, 43 So. 235. In that case trial counsel for the injured plaintiff in his argument to the jury stated that if the poor Negro plaintiff did not recover he would be a ward on the county; the money sued for would not be missed by the company; and that certain reports showed there had been many thousands of deaths and injuries by railroads during the past year.
The defendant objected to the statements and moved for a mistrial. The court sustained the objection, denied the motion for mistrial, and instructed the jury not to consider the statement regarding the number of deaths and injuries involving railroads.
This Court said the statements were prejudicial and were not cured by the court's instruction. It refused to reverse on that ground saying that the insufficiency of the court's instruction should have been raised by assignment of error, which was not done.
Nothing was said in the opinion about the exception to the rule requiring objection to improper conduct of counsel.
(2) Tampa Transit Lines v. Corbin, Fla. 1953, 62 So.2d 10. In this case, a suit for personal injuries, the attorney for plaintiff in argument before the jury made statements regarding the health of the plaintiff as he, the attorney, knew it to exist prior to the accident; statements regarding the high priced attorneys kept on retainer by the defendant bus company for the purpose of defeating all claims, regardless of how just they may be; and similar improper statements.
Counsel for defendant made appropriate objections. The opinion of this *590 Court does not state whether or not the trial judge sustained the objections or that he instructed the jury to ignore such remarks.
This Court made no mention of the exception to the rule requiring objection to improper conduct.
It did at page 12 of 62 So.2d, say that:
"Verdicts rendered by a jury, after having heard such incompetent testimony from an attorney and such highly prejudicial remarks, under the circumstances as shown by this case, cannot be permitted to stand."
The cause was reversed for new trial.
A reading of the two cases last discussed will reveal that neither was authority for the limitation placed on the exception to the rule announced in the Seaboard Air Line Railroad Co. v. Strickland case, if indeed such can be considered as limiting the exception.
Further, it is to be noted that in each of these cases the improper conduct occurred only during closing argument to the jury.
Three of the cases cited in the Strickland case were decisions of federal courts. They are:
(1) New York Central R. Co. v. Johnson, 1929, 279 U.S. 310, 49 S.Ct. 300, 303, 73 L.Ed. 706. In that case the prejudicial remarks were made in closing argument and were objected to by opposing counsel. The court, in its opinion, made no comment that the prejudicial remarks or conduct must pervade or extend throughout the trial.
(2) Robinson v. Penn. R. Co., 3 Cir., 1954, 214 F.2d 798, 802. The remarks occurred, primarily if not altogether, in closing argument to the jury. Several of the improper statements were objected to and some were not. The court did not admonish the jury to disregard them.
In its opinion the court, at 214 F.2d at page 802, recognized the general rule against appellate court action where no objection is made to improper conduct and then said:
"* * * we have never understood it to be the law that flagrantly abusive statements, unsupported by the evidence and introducing matters clearly irrelevant to the jury's deliberation of the issues on the law and evidence, in the absence of an admonition to the jury, are immune from appellate redress simply because there was not an objection to each such statement * * *."
In this case both counsel were apparently guilty of some misconduct. The court was of the opinion that such conduct diverted the jury's attention from the real issues in the cause. The court did not define the exception in the broad terms used in the Seaboard Air Line Railroad Co. v. Strickland case.
(3) United States v. American Die & Instrument Works, Inc., 3 Cir., 1954, 213 F.2d 731, 733. In this case, a criminal case, the improper remarks occurred throughout the trial, with the worse coming during closing argument to the jury. The court stated that the improprieties "pervaded" the trial and "must have disrupted and impeded the orderly presentation and rational consideration of the evidence." The court did not, however, announce any definition of the exception or indicate that it was necessary that the impropriety extend throughout the trial to warrant appellate review of such conduct in the absence of specific objections thereto.
From the foregoing consideration of the cases cited in the Seaboard Air Line Railroad Co. v. Strickland case it is seen that they give little or no real support to the definition of the exception as stated therein.
*591 Further, they do not support the view indicated in the majority opinion that since they occurred in closing argument the collective impact of the improper remarks cannot be said to have extended or spread through the whole trial. As indicated above, in three of the cases cited in the Seaboard Air Line Railroad Co. v. Strickland case the improper conduct occurred in closing argument and in the other two the worse conduct occurred in such argument.
In the majority opinion the case of Baggett v. Davis, 169 So. 372, supra, is cited in support of the definition of the exception to the rule involved here.
In the Baggett case the prejudicial statement was made in closing argument and was not objected to. In its opinion this Court did not define the objection in the broad terms as in the Seaboard Air Line Railroad Co. v. Strickland case, but rather followed the definition used in criminal case, citing Akin v. State, 98 So. 609, supra, in support. As stated in the Akin case, at page 612, the exception operates in criminal cases when:
"* * * the improper remarks are of such character that either (sic) rebuke nor retraction may entirely destroy their sinister influence, in such event a new trial should be awarded regardless of the want of objection or exception * * *."
I return then to my interpretation of the statement of the exception to the rule in Seaboard Air Line Railroad Co. v. Strickland, and I repeat that as I understand that statement this Court did not in making it intend to limit the operation of the exception to the rule, involved there and here, only to those cases where the improper statements or conduct were repeated throughout the trial.
In the Seaboard Air Line Railroad Co. v. Strickland case the conduct did occur throughout the trial and it is understandable that the court would have stated the exception as it did for as stated it applied to the facts of that case.
Nevertheless, this statement of the exception was not intended to be the definition thereof which would be used in every case.
It is my view that the vital question for decision in every such case is whether the misconduct is likely to gravely impair the jury's calm and dispassionate consideration of the evidence and the merits involved in the case, not when or how many times it occurred. True, misconduct which is repeated more than once is likely to have a more serious effect and be more difficult to erase from the mind of the jury. But this is only matter of degree, not of kind. Depending on the nature of the cause and the import of the misconduct it can well be that one instance of misconduct in closing argument will be more prejudicial than many lesser infractions committed over the course of the trial.
In fine, it is my view that the failure of counsel to object to prejudicial remarks or misconduct of opposing counsel does not bar appellate redress thereof if the remarks or misconduct are of such impact as to gravely impair a calm and dispassionate consideration of the issues and merits of the cause, i.e. to deny to the party prejudiced the receiving of a fair trial.
In the cause now before us counsel for the plaintiff in his opening argument to the jury at the conclusion of the trial made statements which fill 22 pages of the record before us.
Included in these statements were the following which we consider to be improper:
"You know, you can take these railroad cases and corporate cases, they all follow a very near pattern. For instance, before Clayton was buried, they was up there trying to get out evidence, taking statements to keep from paying this widow; up there the same day of the wreck before this poor *592 widow had an opportunity to get him in the ground, up there taking statements, uncontradicted testimony, to try to keep from paying, to try to keep from paying her and these little old children. And then Gentlemen of the Jury, you'll then begin to see them get good lawyers. There's my good friend, Lewis Hall, one of the most talented, popular lawyers in Tallahassee, able to handle the case, brillant lawyer. But is the corporation satisfied with Mr. Hall's services? Go out and get Mr. Hartwell another brilliant lawyer. Money is no question there, Gentlemen of the Jury. And do you think they're satisfied with those two top-standing lawyers in Tallahassee? Why, they go over there, way over to Franklin County and get an ex-senator of this County to come over here to try to keep from paying any money. Three outstanding, popular members of the bar here in this little old case where this little old widow woman is trying to get what she's justly entitled to get and her just dues. You know, I guess they assume it's a secret that a million dollars for defense but not a penny for compromise. Not one, not two, but three of the outstanding lawyers in this area come here to try to prevent this little old widow and the children from getting a little bit of money she's justly entitled to."
Plaintiff's counsel next explained that the pictures of the accident scene introduced by plaintiff were taken about 5 weeks after the accident and then said:
"* * * But when did the corporation make their pictures? They got those statements before he was buried. * * *"
A little later plaintiff's counsel made the following statement:
"You know, Gentlemen of the Jury, all the world they had there in the way of signs by the railroad was an old rusty sign at that railroad crossin on one side. That's all. But what have they got now? I say to you Gentlemen of the Jury if that corporation had spent the money that they have spent since on that crossing, there never would have been a killing. * * *"
"* * * In other words, what is another man unless he can be some gain to that corporation, knowing its enterprise? What is a mere human being, dead or alive, unless he can contribute something to the fortune and the future of the Apalachicola Northern Railroad?"
"* * * Gentlemen of the Jury, you know that accident wouldn't have happened today. You know that Tyus, Clayton Tyus would have been fondling his little brood today if the corporation that operates that railroad had taken the precaution to protect those who was traversing that track like they have since by putting up blinkers."
Counsel for defendant objected to the foregoing remarks about the changes in condition of the track and scene of the accident. The trial judge sustained the objection then admonished the jury to disregard such remarks.
Later plaintiff's counsel, speaking of the defendant's failure to put up warning signals, said:
"* * * but they didn't value the life of a human being enough to do it. They didn't value the life of somebody crossing that track enough to do it. They were holding on to that almighty dollar so close, holding it so greedily, so close until they wouldn't spend enough money to put some sort of a signal there so that Tyus would have known his life was about to be snuffed out. I don't believe you gentlemen are going to let this little widow down. * * *"
"* * * The corporation has snuffed another human being's life out in pursuit of the almighty dollar. And *593 now they're appearing before you with three retained lawyers in this area to keep from paying money or as little as they can get by with. That's their mode of operandi. That's the way they figure. And I don't think you or I want to condone doing such a thing particularly when that little old woman will have to go home every night at that little house of hers alone, with those children, unsupported, no comfort, nobody to bring her a dime, nobody to buy her a nickel's worth of bread except her own efforts, nobody to go to church with her on Sunday."
Thereafter counsel for plaintiff related to the jury a conversation between himself and a witness, which remarks were not in evidence. Defense counsel objected and the court sustained the objection.
Later he again referred to the defendant's love for the dollar, saying:
"* * * The Railroad was up there trying to protect their Almighty dollar just like they're doing right here today, before the father of these little old orphan children could be buried."
At a later time in his argument plaintiff's counsel in discussing the damages which he asked the jury to award stated that in his lifetime Clayton Tyus would have earned $106,560.00 and that the jury should award that sum as a minimum. Then he said:
"* * * Furthermore, these brilliant, capable, caustious, corporate lawyers are going to argue that's the wrong scale. You've got to bring it down to its present value, present value."
Defense counsel objected and asked for a mistrial on the ground that the law of Florida, not the corporate lawyers, required that the damage for loss of earnings be reduced to present value. The court sustained the objection, denied the motion for mistrial, and explained to the jury that the law required that such damages be reduced to present value whether the defendant was an individual or a corporation.
Counsel for defendant made his argument to the jury and was followed again by counsel for the plaintiff. At one point in his argument counsel for plaintiff stated:
"Now Gentlemen of the Jury, in conclusion I want you, in considering this case, to give consideration to the rights and privileges of the citizens of Liberty County with reference to what I contend was a negligent murder. I want you to give consideration to that and I want you by your verdict to let the Apalachicola Northern Railroad. * * *"
Defense counsel objected to the reference to the commission of a crime by defendant, asking that the remarks be stricken and that counsel be admonished to desist from making such statements. In response the court merely said:
"There's no criminal offense charged."
* * * * * *
"No damages are entitled to be assessed or awarded because of any criminal offense."
The court did not indicate whether he sustained the objection or not. He did not order the remarks to be stricken from the record or advise the jury to disregard them.
Later counsel for plaintiff again referred to the matter of damages. Defense counsel objected to such remarks and moved for mistrial on the ground that such statements were improper in that since they had not mentioned damages in their argument to the jury it was improper for the plaintiff to do so in rebuttal argument. Defendant had objected to similar remarks twice before. The court sustained the objection but denied the mistrial.
*594 A reading of the argument of plaintiff's counsel, particularly the excerpts above set forth, convincingly reveal repeated efforts to invoke the sympathy of the jury for the plaintiff and her children and to create prejudice in the mind of the jury against the defendant railroad.
Plaintiff's counsel in effect suggested strongly that the action of the railroad in moving to investigate the accident and obtain statements from witnesses constituted a sacrilege against the dead, was done only in an effort to try to prevent payment of damages justly due a poor widow, and was an advantage taken of the widow.
All members of the legal profession as well as all law enforcement officers know the wisdom, if not the necessity, of immediate action in investigation of accidents of all kinds and in recording the knowledge of witnesses into written statements.
The statements of plaintiff's counsel condemning the prompt investigation by the railroad and charging that the investigation was undertaken in an effort to "keep from paying her and these little old children" were improper and prejudicial.
Those statements of plaintiff's counsel complaining that the railroad had hired not one, but three brilliant lawyers "to try to keep from paying any money", which reference to the presence in the case of three brilliant "retained" lawyers was mentioned several times, are strikingly similar to those condemned as being highly prejudicial by this Court in Tampa Transit Lines v. Corbin, 62 So.2d 10, supra. The same is true of the statement that the railroad would spend "* * * a million dollars for defense but not a penny for compromise" and that such was the "mode of operandi" of the railroad.
The continued reference to the plaintiff as a poor little old woman and a poor little widow and the statements relating to her financial plight were calculated to, and were almost certain to, incur the sympathy of the jury in favor of plaintiff, without regard to the merits of the cause. This course of conduct is highly improper for the respective wealth of the parties has no bearing either upon whether the defendant should be held liable in damages or as to the amount thereof in a cause such as this.
The several references of plaintiff's counsel to the railroad's complete disregard for human life in its pursuit of the "Almighty dollar", the statements that the railroad did not value human life enough to put up warning signals, and the statement "the corporation has snuffed another human being's life out" were all highly prejudicial to the defendant.
Likewise the statements of counsel relative to the erection of blinkers and clearing of the right of way at the scene of the accident after the occurrence of the accident here involved were highly improper. They were certain to incorrectly impress the jury that the railroad must have felt the crossing inadequately protected at the time of the accident. As the trial judge explained to the jury, such changes were not subject to consideration of the jury under the circumstances of this case.
The remark of counsel that the jury should "* * * give consideration to the rights and privileges of the citizens of Liberty County with reference to what I contend was a negligent murder" (emphasis added) was perhaps the most prejudicial of all the improper statements involved here. Not only did it suggest that the defendant had committed a crime, but it suggested to the jury that their "rights and privileges" as citizens of Liberty County had been invaded by the "negligent murder" of Clayton Tyus and that they therefore had the right to avenge the invasion of their rights by punishing the railroad through a judgment awarded to the plaintiff.
Obviously, the rights and privileges of the jurors, or other citizens of Liberty *595 County, are not involved in this cause. Further, civil actions such as this one are designed to furnish compensation for negligent injuries, not as punishment for criminal acts.
Assuming that it would be possible to do so, which we seriously doubt, the statements by the trial judge, which followed the defendant's objections, that there was no crime charged and that no damages "are entitled" to be awarded because of any criminal offense in our opinion were insufficient to correct the prejudicial effect of such remarks by counsel. The judge neither sustained nor overruled the defense's objection, nor did he admonish the jury to ignore the remarks.
I am of the opinion that the remarks of counsel above set forth could reasonably be expected to have diverted the attention of the jury from the real issues involved in the cause and caused the jury to have rendered a verdict based upon or materially influenced by sympathy, passion, and prejudice.
It is true of course that counsel for defendant did not object to many of the prejudicial statements involved herein. Objection should have been made.
Nevertheless, the failure of defense counsel to object thereto is not a bar to appellate redress in this case because I am of the opinion, as was the District Court, that such statements gravely impaired a calm and dispassionate consideration of the evidence and merits by the jury. I am of the further opinion that the action by the court in ruling on the objection to the statements of plaintiff's counsel regarding "negligent murder" and inviting vengeance by the jury was insufficient.
The exception to the rule requiring objection by counsel to improper conduct is a sound one.
It is easily understood when it is considered that the responsibility for conducting a trial in a proper manner rests on the court and on each party thereto and on each counsel, if the parties are so represented.
Unquestionably, it is the trial judge's responsibility, as the impartial judicial officer in charge of the proceeding, "to protect litigants against such interference by counsel with the orderly administration of justice and the protection of the right of the litigant to a verdict `uninfluenced by the appeals of counsel to passion or prejudice.'" Seaboard Air Line Railroad Co. v. Strickland, 88 So.2d 519, 524, supra. The trial judge has the duty "whether requested or not, to check improper remarks of counsel to the jury, and to seek by proper instructions to the jury to remove any prejudicial effect they may be calculated to have against the opposite party." Akin v. State, 98 So. 609, 612, supra. This duty is the same in civil as well as in criminal proceedings.
This does not mean, however, that the trial judge is the only one charged with the duty of protecting the rights of the litigants to a fair trial. Counsel for each litigant has the duty to protect his client's cause against the effect of improper conduct by calling attention of the court to such conduct.
Equally, if not more important, is the duty of counsel to see to it that "his conduct during the cause [of the trial] must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury." Seaboard Air Line Railroad Co. v. Strickland, 88 So.2d 519, 523, supra.
Thus, counsel in a litigated cause has not only the duty to advocate the cause of his client to the best advantage of his client, but he, as an officer of the court, also has an equally compelling duty to see to it that the opposing party's right to a fair trial on the evidence and merits is not disadvantaged by his conduct.
It seems to me that it matters not whether the prejudicial effect of grave, *596 improper conduct is allowed to occur because of failure to act on the part of the trial judge or the counsel of the party prejudiced, or because of the positive action of counsel for the opposing party. The damage is the same. It should be remedied wherever in the judicial process it is made to appear.
I do not intend that what I have said should be taken to mean that counsel for the party offended against has the right to sit by idly while improper prejudicial conduct is committed to the detriment of his client's cause. He should not do so. If he does so and the prejudice is not such as can be said to gravely affect a determination of the cause by the jury on the merits and evidence he cannot thereafter seek the aid of a court for the infraction.
It is not difficult in this case to find that the prejudicial conduct involved did in fact divert the jury from returning a verdict on the evidence and merits.
As charged by the court the elements of damage to be considered by the jury were (1) loss of comfort, protection and society of the deceased husband; (2) marital relations; (3) loss of his services in assisting in care of the family; and (4) loss of support.
The principal element of damage was loss of support, based upon the husband's earnings. The evidence showed that the present value of loss of earnings over the decedent's life expectancy was $52,938.36. The verdict of the jury was for $53,230.00.
This was a case in which the evidence clearly demonstrates that the plaintiff's deceased husband was guilty of negligence. Only a slender thread prevents my agreeing with the District Court of Appeal that the decedent's negligence was the sole proximate cause of the accident. The jury was required to compare the negligence of the defendant and decedent and reduce the amount of plaintiff's damages by the percentage of decedent's negligence. It seems clear to me that the jury did not do so. I have no difficulty in relating the misconduct of plaintiff's counsel to this apparent failure of the jury to return a verdict on the evidence and the merits.
I would reverse the cause for a new trial.
ROBERTS and DREW, JJ., concur.
NOTES
[1] Fla.App. 1959, 114 So.2d 33, 35.
[2] Martin v. Rivera, 99 So.2d 617, 618. In this case the District Court of Appeal, Third District, stated, and we quote with approval:

"The many photographic exhibits show the curve of the tracks approaching the crossing and numerous pine trees and brush, which the jury may have found obstructed the driver's vision. In addition, there is serious conflict in the evidence as to whether the railroad train gave warning signals, and, if they were given, when they were given." (Italics supplied.)
[3] Myers v. Atlantic Coast Line Railroad Co., Fla. 1959, 112 So.2d 263; Cadore v. Karp, Fla. 1957, 91 So.2d 806; Loftin v. Joyner, Fla. 1952, 60 So.2d 154; Atlantic Coast Line Railroad Co. v. Gary, Fla. 1951, 57 So.2d 10; Bassett v. Edwards, 158 Fla. 848, 30 So.2d 374; Jones v. Stoddard, 138 Fla. 458, 189 So. 400; Cobb v. Twitchell, 91 Fla. 539, 108 So. 186, 45 A.L.R. 865; Louisville & N.R. Co. v. English, 78 Fla. 211, 82 So. 819; Wood Lumber Co. v. Gipson, 63 Fla. 316, 58 So. 364; German-American Lumber Co. v. Brock, 55 Fla. 577, 46 So. 740, 53 Am.Jur., Trial, § 178 (cases cited therein).
[4] See also Loftin et al. v. Kubica, Fla. 1953, 68 So.2d 390, 392.
[5] 20 Am.Jur., Evidence, Sections 1186-1188 and 98 A.L.R. 161.
[6] Evidence of No Crossing Signals  Force, 162 A.L.R. 9, 13.
[a] See Pinkerton-Hays Lumber Company v. Pope, Fla., 127 So.2d 441-443: first paragraph under [2] page 443.
[7] Compare Ford v. Carpenter, 1949, 147 Tex. 447, 216 S.W.2d 558, and Holland v. Nimitz, 1922, 111 Tex. 419, 239 S.W. 185.
[8] It is deemed appropriate to observe that the opinion in the Myers case was filed subsequent to the trial of the instant suit in the circuit court in and for Liberty County.
[9] Fla. 1956, 88 So.2d 519.
[10] See also Baggett v. Davis, 1936, 124 Fla. 701, 169 So. 372, 379.
[11] Examine Seaboard Air Line Railroad Co. v. Braddock, Fla. 1957, 96 So.2d 127.
[12] See McAllister v. Tucker, Fla. 1957, 93 So.2d 83, 84. This was our final opinion and decision on rehearing. It was not mentioned in the District Court's opinion herein, although our original opinion in the McAllister case (88 So.2d 526), from which we receded, was cited. See also McAllister Hotel, Inc. v. Porte, Fla., 123 So.2d 339.