COBB, Judge.
The issue in this case is whether the trial court erred in denying a defense motion for judgment of acquittal at the conclusion of the evidence based upon an assertion of self-defense. See Brown v. State, 454 So.2d 596 (Fla. 5th DCA), review denied, 461 So.2d 116 (Fla.1984).
The defendant, James Henderson, was convicted of second-degree murder, use of a firearm in the commission of a felony, and carrying a concealed firearm. These charges arose from the shooting of the victim, Jimmy Lee Edwards, by Henderson. The issue at trial, as shown by the state’s opening argument, was whether the shooting was done in self-defense. Certain facts are not in dispute: Henderson was in a Ford Bronco vehicle driven by one Johnny Eastham, along with three other white occupants (Chris Eastham, Rhonda Butcher and Dina Henderson) during the evening of April 5, 1985. They drove past two blacks, Edwards and Priscilla Brisbane, an 11-year-old girl, who were on a bicycle. Henderson made a derogatory remark to Edwards, and Edwards responded. Henderson got out of the Bronco, Edwards got off his bicycle, and there was a confrontation in the middle of the street. It is acknowledged by all that at some point in the confrontation Edwards had a butcher knife and Henderson had a handgun. Pri- or to the shooting, Eastham drove his Bronco between Henderson and Edwards, thereby separating them. Brisbane, the sole eyewitness for the state, acknowledged this fact. Eastham testified he did this to protect Henderson from Edwards, who was advancing with the knife. At that point in the fracas, the combatants, Henderson and Edwards, were separated.
The ultimate question, then, was who renewed the confrontation after this separation. The state’s sole witness in this regard was Brisbane. She testified:
Q. (By the prosecutor) Miss Brisbane, when the truck turned around and came back, you said that he almost ran Jimmy Lee down. You said that the white man was on the other side of the street. Did the truck actually pass between Jimmy and the white man?
A. The white man got out of the way and the truck had ran Jimmy Lee over by the mailbox and he went up on the truck and Jimmy Lee went all the way back by the tree.
Q. So was the white man on the other side of the truck?
A. He had got on the other side of the truck.
Q. Miss Brisbane, from what you saw, had the truck come back through and pushed Jimmy Lee Edwards back?
A. He had to get out of the way.
Q. Was there anything preventing the white man from getting back in that truck and leaving?
*634 MR. PERRY: Objection, Your Honor. It’s not within the scope of her knowledge.
MS. MARSHALL: I believe she was an eyewitness, Your Honor.
THE COURT: If she can answer that question, I’ll allow it to stand.
Q. (By Ms. Marshall) From what you could see, was there anything preventing or keeping the white man from getting back in that truck and leaving?
A. No. The lady, she told him don’t do it, but he did it anyway.
Q. But there was nothing to keep him from getting back in that truck and leaving?
A. (Shakes head)
Q. No? Tell me.
A. No.
MS. MARSHALL: I have no further questions. (Emphasis added.)
It is apparent from the above testimony that the state failed to explicitly ask its witness whether Edwards came around the truck after Henderson or Henderson came around the truck after Edwards. Earlier in the direct examination of Brisbane, she gave equivocal testimony in regard to this issue:
Q. Miss Brisbane, what happened right after the white man jumped off the back of the truck?
A. He was reaching from the back of his pants.
Q. Okay. What happened then?
A. Then he shot him. Both of them — Jimmy Lee — I believe Jimmy Lee had a knife and he pulled out his gun and shot him and jumped in the back of the truck and left.
Q. Did you ever see Jimmy Lee Edwards pull a knife?
A. I didn’t see him, but he was just reaching back there for something.
Q. Did you ever see Jimmy Lee Edwards try to cut the white man?
A. No.
Q. Did he ever approach the white man?
A. No. I didn’t see.
The prosecutor failed to ascertain, by any further questioning, whether the words, “I didn’t see” referred to the fact that Brisbane’s view was obscured by the Bronco, or that she had already turned away to flee home, or that she was looking at the combatants and positively saw that Edwards made no aggressive move with a knife toward Henderson immediately prior to being shot. Such negative testimony as that given by Brisbane has consistently been held insufficient to create a factual issue in the face of positive testimony. See Welfare v. Seaboard Coast Line R. Co., 373 So.2d 886 (Fla.1979); Tyus v. Apalachicola Northern Railroad Company, 130 So.2d 580 (Fla.1961); Powell v. Gary, 146 Fla. 334, 200 So. 854 (1941); Seaboard Air Line R. Co. v. Myrick, 91 Fla. 918, 109 So. 193 (1926).[1]
It is clear from Brisbane’s testimony that Edwards was not shot prior to the intervention of the Bronco between the combatants. It is also clear from other state witnesses that the body of Edwards was found accompanied by a butcher knife with an eight-inch blade near the scene of the shooting. The state makes no pretense that Edwards was unarmed. Indeed, had Edwards not produced the knife during the confrontation, there is no way the defense witnesses could have known about it when their statements were taken several days after the incident. The testimony of Brisbane, “No, I didn’t see” in answer to the question as to whether Edwards ever approached Henderson is simply not sufficient, as required by Brown, to negate Henderson’s theory of self-defense.
Consistent with the state’s evidence that Henderson “went up on the truck” after the Bronco separated the combatants (and consistent with the absence of any state testimony that he thereafter approached Edwards), Henderson and three eye *635 witnesses in the Bronco[2] all testified that Edwards came after Henderson with the knife after Henderson retreated and was attempting to get back into the Bronco, resulting in Henderson shooting Edwards in self-defense.[3] Although the credibility of that testimony was a matter for the jury, it nevertheless demonstrates that the issue presented at trial was self-defense. Illustrative of such testimony was that given by Rhonda Butcher:
Q When Jim Henderson stepped out or jumped out of the Bronco, did you see what the black man did?
A He got off the bike and he threw it to the ground and stood at the edge. He reached for his pants leg and then he started walking toward Jimmy pretty fast.
Q What did Jimmy do at that point in time?
A Just he said, “I have a gun. Let’s just put whatever you have down and we’ll fight.”
Q What did the black man say in response?
A He didn’t say anything, that I could hear — he just kept coming toward him.
Q What did you see the black man doing?
A Well, at first, the first thing I saw was, like, a shiny reflection that seemed to be a knife, and it came down like a slashing motion towards Jimmy, and Jimmy just kept backing up, saying, “Whoa, put it down. I have a knife” — I mean, “I have a gun.”
Q How many times did Jim Henderson warn the black man that he had a gun? Tell the jury please.
A Probably about five — six. He said it a lot. He said it the whole time. That’s all he said, “Just put it down. I have a gun.”
Q Did this frighten you?
A I was frightened for Jimmy because he wasn’t letting up on Jimmy. He came after him. Like, I was scared for Jimmy more than I was for the other man.
Q At this point in time that you made these observations, was the truck moving?
A I think it was. I think we made sort of a circle in a four-way area where the street goes this way and that way, and we made a circle in the wide part.
Q Where did Jim Henderson and the black man end up?
A I think there was a park on the other- side of the road where he was, where the man was, and they went across the street and into the park, and they were mostly on the street but I think they came around.
Q And what did you see Jim Henderson do?
A Well, he — the truck came in between them at one point. They were in the street, after they had, like, backed up to and from each other, and the truck separated them, and then the other man came around toward Jimmy and he shot it at the black man.
Q Did you actually see the shot?
A No. No, I didn’t.
Q Did you see the black man come into contact with Jim Henderson?
A No. He was about arm's length, I guess.
Q What was the black man doing at that point in time?
A He was stabbing down. It looked like he was making a slashing motion.
Q Did you hear anything being said by the black man or Jim Henderson?
A No. Jimmy just kept repeating, “Back up. I have a gun. Stop.”
*636 Q What did Jim Henderson do as the shot was being fired? Did you see what he was doing?
A He was backing up.
A reasonable inference from the terse testimony of the state’s only eyewitness (Brisbane) was that Henderson was at the truck trying to get in when the shooting occurred — which is completely consistent with the explicit testimony of all the other eyewitnesses to the shooting. Moreover, there was unrefuted evidence adduced at trial that urine tests on Edwards showed “cocaine intoxication” at the time of death, which accounted for his sense of invulnerability, according to psychiatric testimony.
In Brown we reversed a second-degree murder conviction because the evidence was legally insufficient to support a conviction “because defendant’s theory of self-defense has been established as a matter of law.” In that case we expressly recognized the principle involved in the instant case:
While the defendant may have the burden of going forward with evidence of self-defense, the burden of proving guilt beyond a reasonable doubt never shifts from the State, and this standard broadly includes the requirement that the State prove that the defendant did not act in self-defense beyond a reasonable doubt.
Brown at 598; accord, Hernandez Ramos v. State, 496 So.2d 837 (Fla. 2d DCA 1986); Bolin v. State, 297 So.2d 317 (Fla. 3d DCA), cert. denied, 304 So.2d 452 (Fla.1974). In the instant case, the negative testimony of the young girl, Priscilla Brisbane, quoted above, cannot support a jury finding that Henderson renewed the combat with Edwards after they were separated by Eastham’s truck. All of the positive testimony at trial was to the contrary. Negative testimony (“I didn’t see”) cannot create a factual conflict with positive testimony (“I saw it happen”), despite the contrary contention of the dissent.
We reverse the murder and firearm use convictions, and affirm the concealed firearm conviction, which was conceded at oral argument, and remand for appropriate re-sentencing.
REVERSED in part; AFFIRMED in part; and REMANDED.
ORFINGER, J., concurs.
HARRIS, C.M., Associate Judge, dissents with opinion.

. The dissent, in accusing the majority of reweighing the evidence, has confused the concept of negative testimony, which has been explained by the Florida Supreme Court in this line of cases, with testimony lacking credibility. Whether testimony is positive or negative is unrelated to the issue of its credibility.

. Chris Eastham essentially testified that he did not see the events, and his testimony was not helpful to either the prosecution or the defense.

. Contrary to the implication of the dissent, there was no impeachment of the defense witnesses on this vital issue (renewal of the conflict). If the jury disregarded this testimony, then none was presented on this issue — upon which the state had the burden of proof.