GRIMES, Justice.
We review Henderson v. State, 507 So. 2d 632 (Fla. 5th DCA 1987), because of conflict with Tyus v. Apalachicola Northern Railroad Co., 130 So.2d 580 (Fla.1961). Our jurisdiction is predicated upon article V, section 3(b)(3) of the Florida Constitution.
James Henderson was convicted of second-degree murder, use of a firearm in the commission of a felony and carrying a concealed firearm, all arising from the shooting of Jimmy Lee Edwards. Henderson and four other white persons were occupants of a Ford Bronco truck being driven in Orlando on the night of April 5, 1985. Henderson, who was in the rear of the truck, had a .25 caliber automatic pistol which he had used to shoot at street lights that evening. While driving through a *1114 black neighborhood, words were exchanged with Edwards, a black man, who passed by on a bicycle. Henderson got out of the truck, Edwards got off his bicycle, and there was a confrontation in the middle of the street. Since the testimony of the state’s witness, Priscilla Brisbane, an eleven-year-old girl who was riding on the bicycle with Edwards, is critical to this decision, it will be quoted in considerable detail:
Q. Okay. Miss Brisbane, when you and Jimmy Lee Edwards were together that night at about 11:18, did you see a group of people in a pickup truck?
A. Yeah.
Q. When was the first time you saw them?
A. When we was stepping up to go to the store.
Q. Did anything happen then?
A. No. They had called him a nigger.
Q. Who called him a nigger?
A. The man that jumped out of the truck and shot him.
Q. Do you remember what the man looked like who jumped out of the truck?
A. He had on a checkerboard shirt, some faded jeans and some boots.
Q. What happened after he said something to Jimmy?
A. He was reaching in the Bronco.
Q. No. Wait a minute. Had you first saw him — let’s try to go through this slowly. When you first saw him and he called Jimmy a name, what happened? What happened next?
A. Jimmy Lee called him a name back.
Q. Okay. What happened after that?
A. Then they got in the middle of the road.
Q. Did the truck do anything? Did the driver of the truck do anything?
A. He tried to run him off the road, Jimmy Lee, over by the mailbox.
Q. Were you still with him when the driver of the truck tried to run him off the road?
A. I was standing up there near Jimmy Lee, and I ran home to get my mama.
Q. What happened after the driver of the truck tried to run you down?
A. He had went all the way down to the end of the road and they left.
Q. Did that happen before or after—
A. After.
Q. —Jimmy Lee got hurt?
A. After.
Q. Well, then what happened when the truck first stopped?
A. They went and jumped off the back of the truck.
Q. Who did?
A. The man that shot Jimmy Lee.
Q. Was the man white or black?
A. White.
Q. Miss Brisbane, what happened right after the white man jumped off the back of the truck?
A. He was reaching from the back of his pants.
Q. Okay. What happened then?
A. Then he shot him. Both of them —Jimmy Lee — I believe Jimmy Lee had a knife and he pulled out his gun and shot him and jumped in the back of the truck and left.
Q. Did you ever see Jimmy Lee Edwards pull a knife?
A. I didn’t see him, but he was just reaching back there for something.
Q. Did you ever see Jimmy Lee Edwards try to cut the white man?
A. No.

Q. Did he ever approach the white man?

A. No. I didn’t see.

Q. Did you hear the white man saying anything?
A. They were not saying nothing when they got off the truck but “Do we want to fight?”
Q. The white man asked Jimmy that?
A. (Nods head)
Q. What happened after he asked him if he wanted to fight?
A. They both got in the middle of the road.
Q. Then what happened?
A. He shot him and jumped in the back of the truck.
*1115 [[Image here]]
Q. You said that they had tried to run you off the road.
A. They had tried to run Jimmy Lee out of the road, and he was out there fighting, messing with him.
[[Image here]]
Q. Miss, Brisbane, you said that the truck tried to run him down after Jimmy was in the street with the white guy, right?
A. He came over when — it was a blue mailbox over there, and he came over when they was — this man was driving the truck with this — see, in the back of the car there was a lady and a baby sitting back there, and the man that shot Jimmy Lee was sitting back there and he jumped out of the back of the truck, and they was in the middle of the road. The man ran Jimmy Lee off the road over by the mailbox.
Q. Okay. Were you standing near him?
A. I was over across the street.
Q. About how far away is that?
A. I don’t remember.
Q. Is it as far as I am from you?
A. (Shakes head)
Q. It’s not that far?
A. (Shakes head)
Q. Is it closer?
A. (Nods head)
Q. Was it about — were you standing about this far away?
A. Yeah.
THE COURT: Indicate for the record the distance.
MS. MARSHALL: It’s approximately eight feet.
THE COURT: I’d say closer to 15.
Q. (By Ms. Marshall) So approximately 15 feet away?
A. I don’t remember, but I remember when he was going in the road, he stand about five feet away from me.
[[Image here]]
Q. Okay. So how far away was Jimmy Lee from the white man that was on the street when the truck came by?
A. They was kind of close. They was about — they was kind of close.
Q. As close as you and I are now?
A. No. They was closer.
Q. Okay. Do you remember if it was about this close?
A. No. They was close between me and her.
THE COURT: Indicating the distance of approximately four feet.
MS. MARSHALL: Okay.
Q. (By Ms. Marshall) Did they ever get any closer to each other than that?
A. No. When they just kept going around in the circle, and they were doing like this and the man just pulled out a gun.
Q. When they were close?
A. Yeah.
Q. Miss Brisbane, when the truck turned around and came back, you said that he almost ran Jimmy Lee down. You said that the white man was on the other side of the street. Did the truck actually pass between Jimmy and the white man?
A. The white man got out of the way and the truck had ran Jimmy Lee over by the mailbox and he went up on the truck and Jimmy Lee went all the way back by the tree.
Q. So was the white man on the other side of the truck?
A. He had got on the other side of the truck.
Q. Miss Brisbane, from what you saw, had the truck come back through and pushed Jimmy Lee Edwards back?
A. He had to get out of the way.
Q. (By Ms. Marshall) From what you could see, was there anything preventing or keeping the white man from getting back in that truck and leaving?
A. No. The lady, she told him don’t do it, but he did it anyway.
Q. But there was nothing to keep him from getting back in that truck and leaving?
A. (Shakes head)
Q. No? Tell me.
*1116 A. No. (Emphasis added.)
The state also introduced as part of its case a statement given by Henderson to the police in which he admitted shooting Edwards. He said that he did so because Edwards was attacking him with a knife. Henderson stated that as soon as the shooting occurred, he and his friends left the scene without knowing whether or not Edwards had died. Henderson later threw the gun into the St. John’s River. The paramedic who first approached Edwards’ body said there was a knife laying on his back. The balance of the state’s case consisted of routine matters concerning the police investigation and proof that Edwards’ death had occurred as a result of the gunshot wound.
In a split decision, the Fifth District Court of Appeal held that the judge should have granted Henderson’s motion for judgment of acquittal on all charges except carrying a concealed firearm, on the premise that the evidence demonstrated, as a matter of law, that the killing was done in self-defense. The district court of appeal, referring to testimony of the occupants of the truck, reasoned that the confrontation had been broken up by virtue of the truck having been driven between Henderson and Edwards. The court focused on who renewed the confrontation after the separation and concluded that the testimony of Brisbane was insufficient to create a factual issue which would permit the case to go to the jury. Thus, the court said:
The prosecutor failed to ascertain, by any further questioning, whether the words, “I didn’t see” referred to the fact that Brisbane’s view was obscured by the Bronco, or that she had already turned away to flee home, or that she was looking at the combatants and positively saw that Edwards made no aggressive move with a knife toward Henderson immediately prior to being shot. Such negative testimony as that given by Brisbane has consistently been held insufficient to create a factual issue in the face of positive testimony. See Welfare v. Seaboard Coast Line R. Co., 373 So.2d 886 (Fla.1979); Tyus v. Apalachicola Northern Railroad Company, 130 So.2d 580 (Fla.1961); Powell v. Gary, 146 Fla. 334, 200 So. 854 (1941); Seaboard Air Line R. Co. v. Myrick, 91 Fla. 918, 109 So. 193 (1926).
507 So.2d at 634 (footnote omitted).
The district court of appeal misapplied the rules concerning positive and negative testimony. In Tyus v. Apalachicola Northern Railroad Co., 130 So.2d 580 (Fla. 1961), this Court stated:
The gist of our rule in relation to negative testimony in the face of positive testimony to the contrary is that if a jury decides that the attention of the witness whose testimony is negative in character, is actually directed to the fact or situation, about which he later testifies, regardless of the reason therefor, said jury may consider such negative testimony and accord to it the weight it may deem proper.
Id. at 585 (emphasis in original). If there are facts from which the jury could reasonably infer that the witness who gives negative testimony has his attention directed to the matter about which he testifies, the jury is entitled to decide if the witness was paying attention and to accord to the testimony such weight as it sees fit. See Seaboard Coast Line R.R. Co. v. Buchman, 358 So.2d 836 (Fla.2d DCA 1978), quashed on other grounds, 381 So.2d 229 (Fla.1980).
At the outset, it would appear that in the context in which the answer was given, the jury had a right to construe Brisbane’s statement, “No. I didn’t see,” as a positive declaration that Edwards did not approach Henderson. However, assuming Brisbane’s statement, “I didn’t see,” was negative testimony, it would still be sufficient to create a factual issue in the face of positive testimony to the contrary unless it were shown that Brisbane’s attention was not directed to the subject about which she was asked. The record in this case permits, if not compels, the conclusion that Brisbane’s attention was directly focused on the actions of Edwards and Henderson as they confronted each other. Thus, it was error to hold that Brisbane’s *1117 testimony was insufficient to create a factual issue.
In addition, we believe the district court of appeal erred in compartmentalizing the confrontation into two separate incidents. According to Brisbane, the truck was being driven as if to hit Edwards, rather than in an effort to separate the combatants. Taken as a whole, Brisbane’s testimony was susceptible of the interpretation that Henderson was the aggressor throughout the confrontation. After first hollering racial epithets at Edwards, he jumped off the truck with a gun and challenged him to fight. Henderson’s wife urged him not to shoot, and according to Brisbane, there was nothing to keep him from getting back into the truck. Brisbane’s testimony does not demonstrate that Henderson acted in self-defense as a matter of law. The fact that Henderson gave a different version of the encounter in his statement simply presented an issue of fact for the jury to resolve.
Much of the opinion of the district court of appeal relates to the testimony of the other occupants of the truck. However, these were defense witnesses presented as part of Henderson's case, and, as noted by the dissent, their testimony was substantially impeached. If Brisbane’s testimony was sufficient to present a jury question, it did not matter that defense witnesses contradicted her version of the events. Unless Brisbane’s testimony established the defense of self-defense, in which event the judgment of acquittal should have been entered at the close of the state’s case rather than at the close of the evidence, it was the jury’s function to decide if that defense was negated beyond a reasonable doubt.
A question was raised in oral argument concerning the effect of a reversal of the decision of the district court of appeal in view of the fact that the mandate of that court had issued and as a consequence the trial judge had discharged Henderson of the charge of second-degree murder and use of a firearm in the commission of a felony. Upon the consideration of supplemental briefs, we now conclude that our decision has the effect of reinstating the judgments of guilt of these crimes. The double jeopardy clause is not offended because there has been neither multiple punishment nor successive prosecution. Thus, in United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Court stated:
Although review of any ruling of law discharging a defendant obviously enhances the likelihood of conviction and subjects him to continuing expense and anxiety, a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact.
Id. at 345 (footnote omitted). Henderson’s further contention that the court has lost jurisdiction over him because the mandate of the district court of appeal was not stayed pending review in this Court is unfounded.
We quash the decision of the district court of appeal and remand for proceedings consistent with this opinion.
It is so ordered.
McDonald, C.J., and OVERTON, EHRLICH, SHAW, BARKETT and KOGAN, JJ., concur.