330 So.2d 761 (1976)
SEABOARD COAST LINE RAILROAD COMPANY and William A. Cagle, Appellants,
v.
Linda S. HELMAN, Appellee.
No. 75-148.
District Court of Appeal of Florida, Fourth District.
April 23, 1976.
Rehearing Denied May 17, 1976.
*762 Frederick J. Ward of Giles, Hedrick & Robinson, P.A., Orlando, for appellants.
James O. Driscoll of Driscoll, Conrad, Langston & Layton, P.A., Orlando, and Gordon V. Frederick, Sanford, for appellee.
OWEN, Judge.
This is a personal injury action arising out of a railroad crossing collision between appellants' train and the vehicle in which plaintiff was a passenger. The jury trial resulted in a verdict and judgment adverse to defendants/appellants.
Plaintiff/appellee tried this case on three theories of negligence on the part of the defendants in the operation of the train at the crossing: (1) defendants operated the train at an excessive speed under the circumstances; (2) defendants failed to give warning of the train's approach, or a warning which was adequate under the circumstances; and (3) defendants failed to maintain a lookout or failed to maintain a proper lookout under the circumstances. Appellants' primary contention is that the evidence is legally insufficient to sustain a finding of negligence in any of these respects as the proximate cause of the collision and the plaintiff's resulting injuries and damages. Having reviewed the evidence relative to the negligence issues in a light most favorable to appellee, we conclude that appellants' point is well taken and that the court erred in not granting appellants' motion for directed verdict at the close of all of the evidence.
The collision under which this suit arose occurred at 8:05 p.m. on August 26, 1972, at the intersection of State Road 431, a paved two-lane highway running in a north and south direction, and a branch line track of appellant-railroad which at that point runs in an east-west direction. This is in an unincorporated area of Seminole County, Florida. The weather was cloudy with slight drizzling rain falling, dusk, but not yet dark. Appellants' train, consisting of the engine, seven cars and caboose, was eastbound. Plaintiff was a passenger in a 1969 Ford pickup truck operated by her husband, Larry Helman, southbound on State Road 431. In the northwest quadrant of the intersection of the road and the track was a residence surrounded by trees and shrubbery, so located that a southbound motorist would have his view of eastbound trains obstructed until he was within seventy-five feet of the crossing. Mr. Helman had entered State Road 431 approximately a half a mile north of the railroad crossing, and from that point had driven south to the point of collision at a speed of approximately forty miles per hour. The window on the passenger side of the truck's cab was up, the windshield wipers were on, the defroster on, and the lights on low beam. Although Mr. Helman was familiar with the road and well aware of the railroad crossing which he was then approaching, he neither heard nor saw the train until he was on or nearly on the track, an instant before the collision. The left front of the engine struck the right front and side of the truck. Appellee, Linda Helman, had no recollection of the accident or of the events immediately preceding it.
We consider first the evidence relating to the alleged lack or inadequacy of warning given by appellant as the train approached the crossing. Since the crossing was well marked (indeed, Mr. Helman was thoroughly familiar with it) and since the dual headlights on the engine were on bright intensity, plaintiff's claim of lack or inadequacy of warning apparently relates solely to the audible warning system.
There was the not unexpected testimony of the train crew. The engineer testified that when the train was approximately one thousand feet west of the crossing, he *763 turned on the automatic bell as one of his warning signals and that it was in continuous operation thereafter to the time of the collision. At the same time, so he said, he commenced the warning air horn signal consisting of two long blasts, a short blast, and a long blast with a pause between each, and he continued to blow the horn in this fashion with maximum intensity up to the time of impact. The brakeman, riding in the engine on the left side, substantially corroborated the engineer's testimony.
There was the testimony of disinterested witnesses. Mr. Marvin Motes, operating a pickup truck northbound on State Road 431, was about fifty yards south of the crossing when he both saw and heard the train approaching from the west. When he brought his vehicle to a stop on the south side of the crossing, the train was then approximately a hundred yards west of the crossing with the horn blowing intermittently. The window of his truck was down but the radio was playing. After Mr. Motes had come to a stop, he observed some three hundred fifty feet north of the crossing the vehicle driven by the witness Susan Thomas (hereafter discussed), and he then observed at about the same distance the Helman vehicle on State Road 431, approaching the crossing from the north. He continued to observe the Helman vehicle up until the collision, during which time the train's horn was being blown intermittently. Susan Thomas was on First Street, approximately three hundred fifty feet north of the crossing, and had stopped at the intersection with State Road 431 to allow the southbound Helman vehicle to pass. Miss Thomas had her window down and heard the train horn blow two or three times from the time the Helmans passed her up to the time of the collision. Morris Hansen, whose residence was on the west side of State Road 431 approximately one-half mile north of the railroad crossing, testified that he was in his house with the windows closed and watching a television program when he heard the train horn blow at least three long blasts for the State Road 431 crossing.
Against this positive testimony of two train crew members and three disinterested witnesses, plaintiff pitted the negative testimony of Mr. Helman that he did not hear a train horn, and the negative testimony of the train's conductor, riding in the caboose, that he did not hear the train horn.
The leading case in this jurisdiction on the sufficiency of negative testimony to sufficiency contradict positive evidence so as to create an issue for the trier of fact is the case of Seaboard Air Line Ry. Co. v. Myrick, 91 Fla. 918, 109 So. 193 (1926), wherein the court said:
"It is not alone sufficient for the injured plaintiff to say that he `did not see' the approaching train, nor hear any whistle or bell or noise of its approach, in order to overcome positive evidence that all ordinary warnings were given of the train's approach. When negative testimony is relied upon to contradict positive evidence, it should appear that the negative statements were made by persons whose attention was directed to the fact that they were looking, watching, and listening for the fact. Not only that the opportunity for observing the fact existed, but that their attention was directed to the fact. The word `see' or `hear,' when used in a negative statement, is often used to express the negation of apprehension or conscious knowledge. One may see or hear and yet not observe; that is, not have a conscious knowledge of the object or noise he actually sees or hears, and, ordinarily, when questioned as to the fact, will say that he did not see or hear. Yet it is certain that in a case like this the defendant cannot be held liable for a failure of duty because the noise of the approaching train, the sounding of its whistle, and ringing of its bell failed to awaken the mental activity of the person injured to that degree where he could be *764 said to have had a conscious knowledge of the existence of the warning sounds.
A mere statement that `I did not see or hear' the train or the noise made by its approach as against affirmative evidence of credible witnesses that it did approach and made sufficient noise in doing so reasonably to attract the attention of others cannot be said to create a conflict of evidence justifying a submission of the question to the jury. See Culhane v. N.Y. Cen. & H.R.R.R. Co., 60 N.Y. 133; Tolman v. Syracuse, B. and N.Y.R.R. Co., 27 Hun. 325; McKeever, Administratrix v. The New York Central & Hudson River Ry. Co., 88 N.Y. 667."
(109 So. at 195-96.)
This rule of law has been consistently recognized and applied by the courts. See, Powell v. Gary, 146 Fla. 334, 200 So. 854 (1941); Loftin v. Kubica, 68 So.2d 390 (Fla. 1953); and Tyus v. Apalachicola Northern Railroad Company, 130 So.2d 580 (Fla. 1961). In this last cited case, the court emphasized that there were certain circumstances under which so-called negative testimony could be "positive in effect" stating, at 585:
"The gist of our rule in relation to negative testimony in the face of positive testimony to the contrary is that if a jury decides that the attention of the witness whose testimony is negative in character, is actually directed to the fact or situation, about which he later testifies, regardless of the reason therefor, said jury may consider such negative testimony and accord to it the weight it may deem proper."
Bearing in mind this teaching of the Tyus case, we have examined the record to see if there are facts from which the jury could reasonably infer that either Mr. Helman or the train conductor had his attention actually directed to the matter of audible signals as the train approached the crossing. We find none, and this being so, it follows under the rule of the Myrick case, supra, that such negative testimony had no probative value. We must conclude that plaintiff/appellee did not establish any negligence on the part of appellants in failing to give an adequate warning of the train's approach.
Plaintiff/appellee introduced evidence of a human factors engineer who opined that the one hundred sixteen decibels of the engine's air horn was simply inadequate in volume or intensity to be heard by the driver of the Helman vehicle because the horn's sound at two hundred feet in front of the engine dropped to approximately seventy-three to seventy-five decibels which was inaudible in the cab of the pickup truck where the noise level was at ninety-three to ninety-seven decibels. Considering the positive testimony of the several disinterested witnesses who were able to hear the horn's sound at various distances from the crossing, such opinion testimony would have no probative value beyond explaining why Mr. Helman did not hear the train's horn. Surely one cannot raise the noise level in one's own vehicle, for example by operation of air-conditioner, radio or tape player, etc. while excluding outside noise, for example by closing all windows, and then be heard to claim that a warning signal was inadequate simply because it could not be heard within the vehicle.
We next consider the evidence relating to the claim that the train was being operated at an excessive speed under the circumstances. The company rule provided for a speed of twenty miles per hour at this crossing. Nowhere do we find any suggestion made that operation of the train at twenty miles per hour is negligence, and all the witnesses' trial testimony on the issue of speed placed the train's speed at twenty miles per hour or less as it entered the crossing. The only evidence to the contrary was the deposition testimony of the train's engineer which, placed into evidence by plaintiff/appellee, stated the *765 train's speed at twenty-five miles per hour. Faced with this apparent inconsistency, the engineer testified that the deposition testimony had been incorrectly reported and he then sought to confirm the inaccuracy of the deposition in two ways: first, by pointing to his testimony that the train was travelling at twenty-five miles per hour at a point approximately six hundred or seven hundred feet west of the crossing when he made a service application of the brakes preparatory to bringing the train to a stop several hundred yards east of the crossing, the effect of which was to materially reduce the speed of the train by the time it reached the crossing; second, by pointing out that at the deposition he had exhibited to plaintiff's counsel the written statement which he had given to his employer on the day following the accident, in which written statement the engineer had stated that the train's speed as it entered the crossing was twenty miles per hour. Assuming, however, that on this evidence the jury could find that (1) the train was travelling twenty-five miles per hour when it entered the intersection, and (2) speed in excess of twenty miles per hour was negligence, it is abundantly clear that the excessive speed was not the proximate cause of the collision. The driver of the pickup truck in which plaintiff/appellee was passenger neither looked nor listened for the train and was completely unaware of the train's approach until an instant before the collision. At that point the collision was inevitable, irrespective of whether the train was then travelling twenty-five miles per hour or only twenty miles per hour.
Finally, we turn to the evidence relating to the alleged failure of appellants to maintain a proper lookout under the circumstances. The only evidence relating to this was from the train crew, primarily the brakeman. He testified that he was, in fact, watching the crossing, that he saw the Helman pickup truck as quickly as it was possible for him to have seen it after it reached a point where his view was no longer obstructed by the residence and trees in the northwest quadrant of the intersection, and that he immediately yelled a warning to the engineer and immediately reached for and applied the emergency brake. Of course, even with a proper lookout and an immediate application of the emergency brake after the danger was noted, the train and the truck were then in such close proximity that the collision was no longer avoidable. It is thus clear not only that was there no evidence to show that appellants had failed to maintain in a proper lookout, but also that the absence of a proper lookout (had such been the case) could not have been the proximate cause of the subsequent collision.
The judgment is reversed and the cause remanded with direction to enter judgment for appellants.
REVERSED and REMANDED.
WALDEN, C.J., and REASBECK, JAMES M., Associate Judge, concur.