McCORD, Chief Judge.;
This is an appeal from final judgment entered upon a jury verdict in favor of appellee Betty Raye Welfare and a verdict in favor of appellee Juanita Welfare, Betty’s mother, for damages sustained by her *477 as a result of Betty’s injuries resulting from a grade crossing collision with a train of appellant Seaboard Coast Line Railroad Company.
The following facts are undisputed. The collision occurred at approximately 12:00 noon on May 25, 1972, during clear, dry weather at the crossing of Walker Street and appellant’s main line tracks within the city limits of Live Oak, Florida. Betty and two of her teen-age girl friends, Cathy Parker and Gwynth Frier, left school in an automobile driven by Betty to go to lunch. They drove north on South Walker Street to its intersection with U.S. Highway 90 where they stopped at a stop sign. From that intersection which was approximately 150 feet due south of the railroad crossing where the accident occurred Betty drove the car northward on Walker Street toward the crossing at 25 m.p.h. All windows of the car were up and the air conditioning and radio were both on inside the car. The radio was on normal volume. As the car approached the crossing, the line of sight was partially obstructed by a U.S. Mail Truck which was parked about 50 feet south of the crossing in the northbound lane on the east side of Walker Street. Betty drove the automobile up to and around the mail truck and moving at a steady pace without looking to the right or the left, she drove onto Seaboard’s main line tracks in front of appellant’s oncoming freight train. She was not driving in a reckless manner otherwise. She and Gwynth Frier were seriously injured and Cathy Parker was killed in the resulting collision. Betty knew the crossing was there and had been over it hundreds of times before. The driver of another car, Katherine Fielding, had already stopped for appellant’s train in the southbound lane of Walker Street on the opposite side of the crossing, and she blew her horn frantically in an attempt to get the attention of Betty but she did not respond.
Appellant’s train consisting of five diesel engines and 138 cars was making a scheduled freight run from Bainbridge, Georgia, to Jacksonville, Florida, when the collision occurred. When the lead engine reached the whistle post for the Walker Street crossing, approximately 1500 feet west of the crossing, the engineer blew the whistle and blew it again at the crossing where the accident occurred. The crossing was equipped with a standard crossbuck warning sign for automobiles. The speed limit for a train at this crossing was 25 m.p.h. The train had a broken speedometer and was traveling at a speed of approximately 50 m.p.h.
The evidence is in conflict as to whether other warnings of the train’s approach were given by the train crew. The engineer testified that as the train entered the city limits of Live Oak, he turned on the bell and began blowing the horn for the crossings ahead. For each crossing, he blew the standard blow which was two long blows, one short blow, then one long blow. When the lead engine reached the whistle post for the Walker Street crossing (approximately 1500 feet west of the crossing as aforesaid) he again began the standard blow. This continued until the lead engine was 80 to 90 feet from the crossing at which point both the engineer and fireman (who was operating the engine at the time) first saw the automobile being driven by Betty Welfare which was only 40-50 feet from the crossing and was just coming around the stopped U.S. Mail Truck. The fireman corroborated the engineer’s testimony and further testified that the engineer then began sounding a continuous blow which was changed to a staccato blow when it became apparent that Betty was not going to attempt to stop for the crossing; that he put the train into emergency stop 20-30 feet from the crossing but it collided with the automobile at a point just to the rear of the front seat on the driver’s side.
Every witness called by appellees and appellant positively testified that he or she at some time did hear the train horn blow before it got to the crossing. (Betty and Gwynth had no remembrance of the accident.) Witness Wilbur Rye, manager of a service station located about 100 feet from the crossing testified that he heard the train horn being sounded before the impact *478 occurred, but he had no recollection of hearing it prior to the train reaching the crossing. Witness Willie Rudd, an auto mechanic, testified that he worked approximately one-quarter mile from the Walker Street crossing and 300 feet from the tracks; that just prior to the collision he was standing in front of his house talking to a customer when appellant’s train came by; that just as the train got to his house, it blew its horn at the whistle post for the Walker Street crossing; that he did not hear it blow again until after the train hit the car. Witness Ben Houston was at the same location as witness Rudd when the train went by. He testified that he heard the train sound its horn when it reached witness Rudd’s house and that he did not again hear it after it passed the house until the lead engine hit the car. He admitted that his attention was not directed to the train after it passed him and until it hit the car at the Walker Street crossing. Witness Osmond Palmer testified that he was heading south on Walker Street toward the crossing (in the opposite direction that Betty was driving); that he did not hear the train’s horn until just before it got to the crossing and after he had stopped for the crossing behind another car; that as he approached the crossing, he was aware that a train was coming and was slowing down for it; that his windows were up and his air conditioning and radio were on while he was driving just before the collision.
Witness Katherine Fielding testified that she first heard the train horn when she was at her husband’s grandmother’s house located about one block north of the Walker Street crossing; that after hearing the horn she got out into her car, backed out of the driveway and headed toward the crossing; that during this entire period of time she heard the train’s horn blowing, and it was still being sounded when she stopped her car at the crossing to wait for the train to pass; that after she had stopped she observed the car Betty was driving come around the stopped mail truck and head straight for the crossing; that when she first observed Betty’s car the train was sounding its horn and when it became obvious to her that Betty was not going to try to stop, she blew her own car horn to try to get Betty’s attention; that all the while the train’s horn kept sounding. She further testified that the headlight on the lead engine was working at all times and that had Betty looked to her left down the tracks, she could have seen the oncoming train prior to running onto the crossing. Witness Fielding was the only eyewitness to the accident other than the train crew.
Appellant contends that the trial court committed reversible error in not granting its motion for directed verdict made by it at the close of all of the evidence. We agree and reverse.
While at first glance it appears that there is conflict in the evidence as to whether or not the train gave an adequate warning of its approach, when we apply the rule established by the Supreme Court in Seaboard Air Line Railway Company v. Myrick, 91 Fla. 918, 109 So. 193 (1926), the negative testimony of the witnesses who testified that they did not hear the train’s horn blow at particular times prior to the accident must be discarded as it cannot stand against the positive testimony of the train crew and eye witness Fielding that the engine’s horn was blowing constantly for a considerable period prior to the accident. This is so because the negative testimony of the other witnesses does not affirmatively show that their attention was directed to the fact of whether or not the horn was blowing. In Myrick the Supreme Court said:
“It is not alone sufficient for the injured Plaintiff to say that he ‘did not see’ the approaching train, nor hear any whistle or bell or noise of its approach, in order to overcome positive evidence that all ordinary warnings were given of the train’s approach. When negative testimony is relied upon to contradict positive evidence, it should appear that the negative statements were made by persons whose attention was directed to the fact that they were looking, watching, and listening for the fact. Not only that the op *479 portunity for observing the fact existed, but that their attention was directed to the fact.
“A mere statement that T did not see or hear’ the train or noise made by its approach as against affirmative evidence of credible witnesses that it did approach and made sufficient noise in doing so reasonably to attract the attention of others cannot be said to create a conflict of evidence justifying a submission of the question to the jury.”
This rule has been continuously recognized in the following cases: Powell v. Gary, 146 Fla. 334, 200 So. 854 (1941); Loftin v. Kubica, 68 So.2d 390 (Fla.1953); Tyus v. Apalachicola Northern Railroad Co., 130 So.2d 580 (Fla.1961); Seaboard Coast Line Railroad Co. v. Helman, 330 So.2d 761 (Fla. 4 DCA 1976).
Appellee also contends that the train’s speed of approximately 50 m.p.h. in violation of the speed limit of 25 m.p.h. at this crossing was negligence which was the proximate cause of the accident. This case was, of course, tried under the doctrine of comparative negligence and if appellant Railroad was guilty of negligence which was a proximate cause of this accident, appellees were entitled to recover. The train’s speed, however, was not a proximate cause of this accident. No evidence was adduced which supports appellees’ contention. It is clear that the sole proximate cause of the accident was the driving of the car onto the track without stopping, slowing down or looking to the right or to the left. When Betty drove onto the track directly in front of the train the collision was inevitable, and it would have made no difference whether the train was going 25 m.p.h. or 50 m.p.h. Compare Seaboard Coast Line Railroad Co. v. Helman, supra.
Appellant also contends that the trial court erred in allowing into evidence the testimony and expert opinions of Norman Korobow, a human factors engineer, who testified in summary that: (1) The sound and visual stimuli presented by appellant Seaboard at the Walker Street crossing at the time of the collision were inadequate to warn a motorist of an approaching train; (2) The lead engine’s fixed beam headlight, although operating on high beam at the time of the collision, was of “zero value” to the motorist (Welfare), but that an oscillating light (mars light) would have been very effective; (3) The effect of the Hancock air horn on the lead engine on the motorist (Welfare) was inadequate, and there were many louder horns available in the state of the arts at that time; and (4) The standard railroad crossbuck warning signs at the Walker Street crossing were not adequate stimulus. Appellant’s objections to this testimony at the trial should have been sustained. The opinions of the witness as to the above matters were based upon assumed facts set forth in a lengthy hypothetical question propounded by appellees and certain answers to interrogatories read into the evidence at the end of his testimony. One of the primary facts he assumed was that the train blew its horn 1500 feet from the crossing but did not blow it again until it was right at the crossing. As we have previously discussed, this assumed fact was not supported by the evidence. Compare Autrey v. Carroll, 240 So.2d 474 (Fla.1970), and Arkin Construction Co. v. Simpkins, 99 So.2d 557 (Fla.1957). Witness Korobow’s expert opinion testimony invaded the province of the jury. Compare Seaboard Coast Line Railroad Co. v. Kubalski, 323 So.2d 32 (Fla. 4 DCA 1975). Our sister court of the Fourth District in Seaboard Coast Line Railroad Co. v. Helman, supra, in addressing itself to the opinion of a “human factors engineer” who had testified that the horn on a train was simply inadequate in volume or intensity to be heard by the motorist there stated:
“Surely, one cannot raise the noise level in one’s own vehicle, for example by operation of air-conditioner, radio or tape player, etc., while excluding outside noise, for example by closing all windows, and then be heard to claim that a warning signal was inadequate simply because it could not be heard within the vehicle.”
We agree with the foregoing statement which is equally applicable to the case sub *480 judice. The witness’ opinions were not based upon correct factual assumptions, and they invaded the province of the jury.
In stating his opinion that crossbucks alone are not sufficient warning of a railroad crossing, witness Korobow’s conclusion would impose upon appellant a greater duty than is imposed by law. In Atlantic Coast Line Railroad Co. v. Wallace, 61 Fla. 93, 54 So. 893 (1911), the Supreme Court said:
“The province of the jury is to determine whether under the facts and circumstances in evidence the defendant was negligent as alleged, and, if there was such negligence, whether it was a proximate cause of the injury complained of. While a determination of whether there was negligence does not depend solely upon a compliance with the requirements of statutes, ordinances, or other lawful governmental regulations, for circumstances may require additional precautions and care, yet the prescribing of particular facilities that may be regarded as essential or useful in preventing injuries from trains at railroad crossings in municipalities or elsewhere is a function that is legislative or administrative in its nature. Ordinarily it is not for a trial jury to determine whether particular methods or facilities should have been used to prevent an injury alleged, when such methods or facilities are not prescribed by competent authority or necessarily required by implication of law. But the jury should determine from all the circumstances in evidence in the particular case whether the defendant is liable in damages for a negligent injury as alleged. Any evidence tending to show whether the railroad company exercised all the care and diligence required by the circumstances of the case is admissible; and the jury should determine whether the requisite degree of care was exercised, and not whether a particular kind of safeguard should have been used. The necessity or advisability of requiring the maintenance of gates at railroad crossings in streets of a municipality may be a matter for the Legislature, the local authorities, the railroad commissioners, or a grand jury to determine; but such determination was not within the province of the trial jury in this case.”
See also McNulty v. Atlantic Coast Line Railroad Co., 198 So.2d 876 (Fla. 2 DCA 1966), cert. discharged, 199 So.2d 706 (Fla.1967); Myers v. Seaboard Air Line Railroad Co., 202 So.2d 624 (Fla. 4 DCA 1967), cert. den., 210 So.2d 224 (Fla.1968); Caudell v. Florida East Coast Railway Co., 201 So.2d 583 (Fla. 3 DCA 1967).
Appellant also contended that the trial court committed reversible error in allowing into evidence the testimony and expert opinions of William Fogarty. He testified as an expert witness in the area of accident reconstruction and safety engineering and his testimony was objected to on the same grounds as appellant had asserted in relation to witness Korobow’s testimony. The objections should have been sustained as his testimony contains the same flaws as did witness Korobow’s testimony.
Reversed and remanded with directions to vacate the judgment for appellees and enter judgment for appellant.
MILLS, J., and YAWN, THERON A., Jr., Associate Judge, concur.