695 So.2d 376 (1997)
SUPERIOR INDUSTRIES INTERNATIONAL, INC., et al., Appellants,
v.
Charles FAULK, Jr., etc., et al., Appellees.
No. 96-1135.
District Court of Appeal of Florida, Fifth District.
March 21, 1997.
Rehearing Denied June 10, 1997.
*377 Robert E. Bonner of Eubanks, Hilyard, Rumbley, Meier & Lengauer, P.A., Orlando, for Appellants.
Richard J. Hoskins, Catherine Masters Epstein, Neil Lloyd and Robert H. Riley of Schiff Hardin & Waite, Chicago, IL, Pro Hac Vice, for Appellants.
Roy B. Dalton, Jr. of Martinez, Dalton, Dellecker & Wilson, P.A. and Brandon S. Peters of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, for Appellees.
COBB, Judge.
Superior Industries International, Inc. (Superior), and Auto Zone, Inc., defendants below, appeal from adverse final judgments and from the denial of their post-trial motions.
This was a personal injury action brought by Charles Faulk, as personal representative of the estate of Bucky Faulk (Faulk), deceased, and Michael Hopper (Hopper). Faulk, the driver, was killed and Hopper, a passenger, seriously injured in a single vehicle wreck which occurred on Highway 17 in Putnam County on April 28, 1993. The plaintiffs sued on theories of negligence and strict liability. The defendants describe the case as an accident in which the sixteen year old Faulk lost control of his pickup truck while traveling approximately 75 miles per hour on a curve on Highway 17. The plaintiffs' cast the case as an accident caused by the catastrophic failure of an aluminum lift block which Faulk had installed on the vehicle, approximately one month before the accident, and which had been designed and manufactured by Superior and sold by Auto Zone.
Faulk owned a 1986 Chevrolet Silverado 4x4 pickup truck. In early 1993, Faulk purchased the lift block kit. Lift blocks are metal, in this case aluminum pieces, used to raise the chassis of a vehicle up off its frame. Faulk installed the lift blocks himself with the assistance of a friend, Callaway.
At approximately 10:00 p.m. on the evening of April 28, 1993, Faulk and a number of his friends decided to drive to a house on West River Road, in three separate vehicles. Faulk's pickup, with Faulk driving and Hopper and Callaway as passengers, was the third vehicle. While traveling north on Highway 17, the first two vehicles "made" the traffic light at the SR 19 intersection. Faulk, however, had to stop for a red light. When the light turned green, Faulk attempted to catch up.
Highway 17 is a four lane divided highway, with a grassy median separating the northbound and southbound lanes. As Faulk traveled north, the road curved slightly to the right. The roadway was dry and the weather clear. According to Callaway, the accident began when Faulk's truck jerked sharply and unexpectedly to the left, running onto the grassy median. There was ample testimony that the truck had been traveling at between 70-75 miles per hour (well above the posted speed limit of 55 miles per hour) when this "jerk" occurred. One hundred and twenty feet later, Faulk was able to bring the truck out of the median, back onto the highway but approximately three hundred and ninety feet later, Faulk's truck ran off the right shoulder of the road and began a two hundred and forty foot sliding arc back toward the median, where it overturned. The truck rolled three and a half times, throwing the occupants onto the road. The cab of the truck was flattened to the level of the seats. After the accident it was discovered that, among other damage to the truck, the lift block on the driver's side was broken.
Faulk installed the two inch aluminum lift blocks himself on the front axle. He began experiencing trouble with the steering of the truck thereafter and took the truck to an ASE certified mechanic, Sweeting, at a Palatka garage. Sweeting determined that the left front lift block had been installed upside down and it was corrected.
Steering and handling problems, however, continued. Faulk's father testified that these problems were attributable to the fact that "the blocks were coming loose." According to a witness who personally inspected the steering mechanism of Faulk's vehicle two weeks before the accident, the entire front of the truck appeared to be improperly "shifting side-to-side." There was testimony from Callaway that during the accident sequence, *378 Faulk struggled with the truck's steering wheel and that it was obvious that the truck was not steering properly.
The plaintiffs adduced testimony from a mechanical engineer and automotive design expert who opined that Superior's lift blocks are inherently dangerous in that they severely degrade a vehicle's steering and handling and significantly increase the chance of a roll over. The lift block's defectiveness is compounded by Superior's failure to provide adequate warnings about these hazards to consumers who purchase them. According to the plaintiffs' expert, the defect caused or contributed to Faulk's inability to control his vehicle. The expert also testified that the aluminum selected by Superior as the component metal for the lift blocks is unsuited for its intended use. There was testimony that other lift blocks on the market were made of steel.
The plaintiffs adduced expert testimony that because of the relatively long time that Faulk had (between the time he first ran into the median and the roll over) to regain control of his truck, a serious mechanical failure altering control of the vehicle had occurred. The investigating highway patrolman was unable to say whether a malfunction in the lift block interfered with Faulk's ability to control his vehicle. The patrolman did opine that speed contributed to or caused the crash.
Superior admitted that it knew installation of the lifts altered the center of gravity of Silverado 4x4's and further that the lifts altered the steering function on such vehicles. Superior admitted that the lift blocks, when installed only in the front of such vehicles negatively impacted the overall riding and handling characteristics of those vehicles. Superior never did stability, handling or control testing of its lift blocks. Even an Auto Zone employee who sells Superior's lift blocks testified they "were made of cheap pop [sic] metal" and "[weren't] very good." That employee had installed Superior's lift blocks on his own vehicle but had to remove them after one of the blocks broke.
The jury returned a verdict for the plaintiffs awarding non-economic damages of $1.5 million to Faulk's estate and $1.5 million to Hopper. The jury assigned no comparative negligence to the decedent. Superior was found to be 95% at fault and Auto Zone, 5% at fault. Following entry of final judgment for the plaintiffs the defendants filed motions for jury interview, remittitur, judgment in accordance with their motions for directed verdict, and new trial. The trial court denied these motions and this appeal follows.
The defendants do not challenge on appeal the sufficiency of the evidence to support the verdict. Rather, three errors are alleged which the defendants claim deprived them of a fair trial. While we find no merit in the defendants' first and third points, we agree with the defendants in regard to their second issue, i.e., that a new trial is necessary because the plaintiffs improperly presented evidence and argument as to punitive damages where recovery of such damages was not sought in the pleadings.
The defendants assert that while the plaintiffs neither explicitly sought nor established entitlement to punitive damages, they repeatedly, through their evidence and arguments, improperly attempted to obtain such damages from the jury. The defendants claim that the compensatory damage awards to the plaintiffs are indicative of the success of the plaintiffs' efforts in this regard.
During the trial, the court granted the defendants' motion in limine ruling that evidence as to Superior's total annual sales was inadmissible. The plaintiffs sought to introduce such evidence to show that Superior had the financial ability to thoroughly test its product before placing in on the market, but had failed to do so. Thereafter, the parties agreed that the video deposition of Superior's vice-president, which included an inquiry concerning Superior's annual sales, would be played for the jury and that the plaintiffs' counsel would sit by the video monitor with a transcript and turn off the volume during the objectionable portion.
However, when the video was played, the question of Superior's total annual sales [$390 million] was asked and answered. The defendants immediately moved for a mistrial. Plaintiffs' counsel apologized for what he said was his inadvertent failure to turn off the *379 volume on one of the monitors and said he did not know whether the jury heard the objectionable matter. Defense counsel said he heard it while the court announced "I frankly didn't hear it. But I think that is probably because I was reading the transcript." The court denied the motion for mistrial and gave a curative instruction.[1]
The defendants assert that a curative instruction was inadequate to obviate the prejudice to its case. The defendants rely on Walt Disney World Co. v. Blalock, 640 So.2d 1156 (Fla. 5th DCA 1994), in this regard. In Blalock, a personal injury action, evidence as to subsequent remedial measures taken by the defendant was admitted in violation of an in limine order, as a result of plaintiffs' counsel's failure to inform his expert witness about the in limine order. A curative instruction was given to disregard the testimony.
This court explained that "Evidence of subsequent remedial measures is inadmissible, of course, as a matter of sound public policy." 640 So.2d at 1158-1159. The court added that a curative instruction was insufficient and quoted from O'Rear v. Fruehauf Corp., 554 F.2d 1304, 1309 (5th Cir.1977): "[Y]ou can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good."
Reversal for a new trial in Blalock, however, was predicated on cumulative misconduct of the plaintiff's counsel, including a closing argument pervaded with inflammatory comments and the personal opinion of counsel with prejudice demonstrated by a verdict which included $275,000 in future medical damages for which there was no evidentiary basis. 640 So.2d at 1159.
Thus, Blalock was not a reversal for a new trial simply because of the erroneous admission of evidence in violation of a court ruling. In this case, the trial court exercised its discretion and declined to grant a mistrial and order a new trial, believing a curative instruction was sufficient. Absent any additional prejudicial error, reversal on this ground alone probably would be unwarranted.
During closing argument, plaintiffs' counsel made the following assertions which the defendants maintain were improper, highly prejudicial and collectively denied them a fair trial:
Because there is nothing really unique about the factual situation in which this terrible tragedy arises because as long as there are sixteen year old boys and as long as there are trucks, there are going to be sixteen year old boys who try to make them look sharper, try to make them sit higher than the one that their buddy has.
And as long as that is the case, there are going to be people in the after market automotive product industry who seek to capitalize on that by marketing this type of product to those young men.
* * * * * *
You jurors have taken on the most important civic responsibility, the most powerful position within our government that there is.
* * * * * *
We havethe Jury has, we have a responsibility, I have a responsibility to the legacy of Bucky Faulk. A responsibility tothe Jury has a responsibility to let Superior Industries know that, you know, it is like we are told when we are children, actions have consequences. And like we tell children, when the consequences of our actions are severe, we better be prepared to step up and take responsibility.
At this point, defense counsel objected, asserting that "I believe that the last comments... were impermissible," designed to ask the jury not simply to compensate the plaintiffs but to punish the defendants when there is no claim for punitive damages. Unfortunately, the court overruled the objection.
*380 In discussing damages, plaintiffs' counsel argued that Faulk's "life ha[d] been snuffed out at the tender age of sixteen." Counsel additionally raised what the defendants label were a "parade of horribles" which were unsupported by evidence in the record:
You know, I wonder if the failure of this block had resulted not only in the horrible tragedy that it did result, the death of Bucky Faulk and the injuries to Mike Hopper, but it had taken out someone else in the process, in another vehicle, I wonder then if we would be hearing about wellI mean, what do we hear from the Defense about this? What do we hear.
* * * * * *
[H]ow is it that Superior Industries International could design a product with that kind of potential for catastrophic failure to have this nipple break off and conceivably cross the median and take out Lord knows how many people in the process, without ever testing it? How could this happen?
* * * * * *
But if this part had failed on a jet aircraft, would we talking [sic] about pilot error being the cause of the crash? No.
* * * * * *
If this accident, at the time the vehicle went into the median for the second time, had resulted in Bucky Faulk's vehicle going all of the way across the median and smashing into a car coming the other way and taking out everybody in the car, would we be talking about the speed of the Faulk vehicle or would we be talking about the fact that this product failed and set these motions into sequence, kick these things off. We wouldn't be talking about speed, if we were looking at those other people. We would be looking at why did this jet plane crash. Because the part failed, not because of pilot error.
No objections to these comments were interposed.
As the defendants point out, many of these remarks were improper. Appeals to "community conscience" and "civic responsibility" are inappropriate. See S.H. Investment v. Kincaid, 495 So.2d 768 (Fla. 5th DCA 1986), rev. denied, 504 So.2d 767 (Fla. 1987). References to the decedent's life being "snuffed out" would seem to improperly and prejudicially insinuate infliction of a deliberate injury. See Blalock (reference in negligence action to the defendant having "ripped off the plaintiff's thumb" when two boats at the defendant's attraction apparently bumped and the defendant's hand was caught between them). Likewise, evoking a parade of imaginary horribles for the jury to consider is improper as referring to facts not in evidence. Id. See also City Provisioners, Inc. v. Anderson, 578 So.2d 855 (Fla. 5th DCA 1991); Wright & Ford Millworks, Inc. v. Long, 412 So.2d 892 (Fla. 5th DCA 1982).
The absence of repeated objections to these improper arguments is not fatal to the defendants' position. See LeRetilley v. Harris, 354 So.2d 1213 (Fla. 4th DCA), cert. denied, 359 So.2d 1216 (Fla.1978). This court has repeatedly reversed personal injury awards and ordered new trials involving improper argument where "the prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Silva v. Nightingale, 619 So.2d 4 (Fla. 5th DCA 1993) quoting Tyus v. Apalachicola Northern R.R. Co., 130 So.2d 580, 587 (Fla.1961); Riley v. Willis, 585 So.2d 1024 (Fla. 5th DCA 1991). Indeed, in Blalock, decided eight months before trial in this case, this court emphasized that it would not condone inflammatory closing arguments even absent objection.
Finally, the defendants note that plaintiffs' counsel repeatedly referred in front of the jury to the fact of Superior's status as a California corporation. The defendants assert that the jury was effectively informed that Superior was a: (1) financially viable, (2) out of state business, facts which were entirely irrelevant to the plaintiffs' claims. The defendants point out that the verdict form, submitted to the jury by stipulation of the parties, references Superior as being a foreign corporation. Nevertheless, the repeated references to Superior as a California corporation, when combined with the other improper argument, seems designed *381 to improperly convey to the Putnam County jury an "us versus them" mentality. This was improper. See Kincaid, 495 So.2d at 771 (condemning "us against them" plea as creating prejudice by pitting "the community" against a nonresident corporation).
Accordingly, we reverse and remand for a new trial on liability and damages.
REVERSED AND REMANDED.
ANTOON, J., and ORFINGER, M., Senior Judge, concur.
NOTES
[1] "Notwithstanding the Court's rulings, certain questions and answers which the Court ruled to be inadmissible were inadvertently published before the noon recess. Therefore, I am instructing you that you should disregard, not consider any question or answer in the disposition of [Superior's vice-president] which you may have heard after the following question and answer...."